573 A.2d 1325

**SUGARLOAF CITIZENS ASSOC., INC. et al.**

v.

**Michael GUDIS and County Council of Montgomery County, Maryland.**

No. 59, Sept. Term, 1989.

Court of Appeals of Maryland.

May 30, 1990.

Ralph Gordon (Albert O. Cornelison, Jr., C. Holly Trimmer, Gordon, Simmons & Cornelison, all on brief), Frederick, for petitioners.

Marc P. Hansen, Sr. Asst. County Atty. (Clyde H. Sorrell, County Atty., both on brief), Rockville, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ADKINS, Judge.

On 7 July 1987 four members of the Montgomery County Council voted in favor of siting a mass-burn resource recovery facility (RRF—a type of incinerator) in the Dickerson area of the county. One of the four members so voting was

respondent Michael Gudis (Gudis).[1] The three remaining councilmembers voted to locate the facility in the Shady Grove area. Later at the same meeting, the council (by vote of 4–1, with Gudis again in the majority) adopted Resolution No. 11–382. Resolution No. 11–382 amended the County's Ten Year Solid Waste Management Plan to include in it the Dickerson mass-burn facility.

The Dickerson site involved land owned by Potomac Electric Power Co. (PEPCO)—land that presumably would have to be leased or purchased by the County to permit operation of the mass-burn facility. The County would also need to coordinate other matters with PEPCO in order to operate the facility. At the time of the July 1987 vote, Councilmember Gudis owned an amount of PEPCO stock sufficient to bring him within the purview of the ethics provisions of the Montgomery County Code, Chapter 19A.[2]

Prior to 7 July 1987 Gudis had obtained from the Montgomery County Ethics Commission a waiver of the conflict-of-interest provision (note 2, *supra*) that otherwise would have prevented him from voting for the Dickerson site.[3]

---

1. The other respondent is the County Council of Montgomery County, Maryland.

2. Section 19A–7(a) of the Montgomery County Code contains broad conflict-of-interest provisions, somewhat similar to those set forth in Md.Code (1986 Repl.Vol. and 1989 Supp.), Article 40A, § 3–101(a). Under the County Code provisions, "[u]nless permitted by a waiver," a councilmember
 may not participate in:
 (1) Any matter which affects, in a manner distinct from its effect on the public generally, ... an entity in which the [councilmember] has ... a financial interest [subject to exceptions not here relevant].
 "Financial interest" is defined in § 19A–4 of the County Code. Under that definition, Gudis had a "financial interest" in PEPCO.

3. Section 19A–6 of the County Code permits the ethics commission to establish ... standards and procedures under which waivers from the prohibitions of ... this chapter may be granted by the ethics commission for public employees, including elected and appointed public officials, to permit such employees ... to perform an act which might otherwise be prohibited by the conflicts of interest provisions of ... this chapter.

On 5 October 1987 petitioners, The Sugarloaf Citizens Association, Inc., Lynn Lipp, and Beverly Thoms, all allegedly taxpayers in Montgomery County (and the latter two residents of the Dickerson area) (collectively Sugarloaf), sued Gudis and the county council in the Circuit Court for Montgomery County. They asked that court to "void the action of the Council in approving" the Dickerson site and in adopting Resolution No. 11–382.

The circuit court declined to do so. It held that "the evidence before the Court supports the proposition that Mr. Gudis'[s] vote was properly cast, since he did, in fact, have a waiver from the Ethics Commission." The Court of Special Appeals affirmed, although it did not reach the question of the validity of the waiver. It held "that no private right of action, implied or otherwise, exists under section 19A–22(b) of the Montgomery County Code." *Sugarloaf Citizens Ass'n v. Gudis*, 78 Md.App. 550, 560, 554 A.2d 434, 439 (1989) [footnote omitted]. Additionally, the intermediate appellate court ruled that even if Sugarloaf had common law taxpayer standing to challenge Resolution No. 11–382, its "disregard for the primary jurisdiction doctrine presents an alternative basis for affirming the trial court's order dismissing [the] action." *Id.* at 561, 554 A.2d at 439.

We affirm the judgment of the Court of Special Appeals, but for reasons totally different from those given by that court. We conclude that § 19A–22(b) of the Montgomery County Code is unconstitutional. Since Sugarloaf relies on that subsection as authority for the court's power to strike down the legislative action here in question, Sugarloaf cannot prevail.

## I.

Montgomery County, like other jurisdictions throughout the State, is faced with substantial solid waste disposal problems. As of April 1985, three principal alternatives were under study:

1. Processing the County's solid waste into fuel which would be burnt in PEPCO's generating plant at Dickerson [RDF];

2. Burning the County's solid waste in a resource recovery facility [near Shady Grove] and selling the resulting energy to PEPCO [RRF]; and

3. Landfilling baled refuse at Travillah Quarry, or expanding the existing landfill.

Because two of these options involved PEPCO, and because Gudis owned PEPCO stock, he had twice (prior to April 1985) asked the ethics commission to waive the conflict-of-interest provisions of the County Code. *See* n. 3, *supra.* The commission denied both requests. Similar action had been taken with respect to other county officials including Lewis Roberts, the Chief Administrative Officer.

In August 1985 Roberts submitted another waiver request to the commission. This one was accompanied by a memorandum from the director of the County's Department of Environmental Protection. The memorandum purported to demonstrate that

no conceivable [solid waste disposal] decision could significantly affect PEPCO finances. In fact, law and policy will compel an exactly zero effect, not merely a small effect.

Memorandum from John L. Menke to Lewis T. Roberts (31 July 1985).

On the strength of this, the commission reconsidered its prior denials. Eventually, by vote taken on 2 December 1985 and announced on 10 December (by way of a press release), it granted waivers to Gudis and Roberts, as well as to another PEPCO stockholder. The waiver stated that the council was considering the following solid waste disposal alternatives:

1. expansion of the existing landfill;

2. siting a new landfill at the Travillah Quarry;

3. construction of a resource recovery facility with sale of electricity to PEPCO [RRF]; and

 4. installation of a refuse derived fuel (RDF) system at the existing PEPCO plant in Dickerson.

The commission observed that selection of either option 3 or 4 would result in "some form of contractual relationship with PEPCO." It explained that

> [t]o provide the greatest opportunity to public officials owning PEPCO stock to participate in future decisions regarding these proposals, the Montgomery County Ethics Commission has determined that those officials who wish to exercise their authority to participate in policy decisions regarding such matters may do so if they publicly disclose their ownership of this stock and the number of shares they own....[4]

Some three months later, at PEPCO's request, the council began to explore a new and different concept—constructing a RRF at Dickerson instead of at Shady Grove. On 7 October 1986 the county executive recommended the Dickerson RRF as the best alternative. This raised the possibility of sale or lease of PEPCO property, a possibility that the County apparently had not considered previously, and that had not been presented to the ethics commission when the waivers were granted.

So matters stood on 7 July 1987 when, as we have recounted, Gudis cast the deciding vote in favor of the Dickerson site and also voted to adopt Resolution No. 11–382—the councilmanic action that authorized use of the Dickerson site for the RRF. It is that action, of course, that Sugarloaf seeks to nullify.

## II.

The foundation of Sugarloaf's attack on the siting vote and its implementing resolution is § 19A–7(a) of the Montgomery County Code. As we have seen, this subsection disqualifies a councilmember from voting in a matter in

---

**4.** Gudis did this.

which the member has a "financial interest." Sugarloaf contends that because Gudis had such an interest by virtue of his stockholdings in PEPCO, and because the waiver of disqualification granted him by the ethics commission was not valid, Gudis was precluded from voting. Sugarloaf asserts, therefore, that the actions resulting from that vote cannot stand.

In its complaint, Sugarloaf relied substantially on § 19A–22 of the County Code. In pertinent part that section reads:

(a) Upon direction by the [ethics] commission or at the initiative of the county attorney, the county attorney may file a petition for injunction or any other appropriate relief in the circuit court for Montgomery County, or in any other court having proper venue, for the purpose of requiring compliance with the provisions of this [ethics law] chapter.

(b) In addition, the court may issue an order to cease and desist from the violation, *and can void an official action taken by an official or employee with a conflict of interest prohibited by this chapter when the action arose from or concerned the subject matter of the conflict* and the legal action was brought within ninety (90) days of the occurrence of the official action, *if the court deems voiding the action to be in the best ... interest of the public* [emphasis supplied].

Because of this reliance, the Court of Special Appeals thought that "the genesis for [Sugarloaf's] cause of action [was] the Montgomery County Ethics Law." *Sugarloaf,* 78 Md.App. at 555, 554 A.2d at 436 [footnote omitted]. The intermediate court held that "no private right of action, implied or otherwise, exists under section 19A–22(b) of the Montgomery County Code." *Id.* at 560, 554 A.2d at 439 [footnote omitted].

Whether § 19A–22(b) creates an implied or express private cause of action is not critical to our decision

and is a question we do not address.[5] A taxpayer or other person specially damaged has standing: to seek to enjoin the implementation of an unconstitutional statute, *Painter v. Mattfeldt*, 119 Md. 466, 87 A. 413 (1913); "to restrain the action of a public official, which is illegal or ultra vires, and may injuriously affect the taxpayer's rights and property," *Inlet Associates v. Assateaque House*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988); *Citizens P & H Ass'n v. County Exec.*, 273 Md. 333, 339, 329 A.2d 681, 684 (1974); or to redress a public wrong, *Becker v. Litty*, 318 Md. 76, 91, 566 A.2d 1101, 1108 (1989). The complaint filed by Sugarloaf in essence seeks that sort of relief, via the invalidation of Resolution No. 11-382. The complaint alleged citizen and taxpayer status. It did not allege, in terms, special damages, although an affidavit filed by petitioner Thoms (in connection with Gudis's motion to dismiss) did. At argument in the trial court on the motion to dismiss, moreover, Sugarloaf said that it was asserting, among other things, a common law right to seek enforcement of the county ethics law. That is the same sort of standing we upheld in *Becker, supra.*[6]

---

**5.** Nor do we consider whether a chartered county constitutionally may create a cause of action of the sort arguably involved here. In *McCrory Corp. v. Fowler*, 319 Md. 12, 24, 570 A.2d 834, 840 (1990), we held that a private judicial remedy to combat employment discrimination was not a " 'local law' under Article XI-A of the Maryland Constitution, and thus ... not within the power of Montgomery County to enact." Judge Eldridge, writing for this Court, explained that "[i]n Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State.... Furthermore, the creation of new judicial remedies has traditionally been done on a statewide basis." 319 Md. at 20, 570 A.2d at 838 [citation omitted]. But a chartered county's power to create a private cause of action with respect to ethics law matters is also a question we need not and do not decide in this case.

**6.** The Court of Special Appeals hinted at the possibility of common law standing in this case, but believed that Sugarloaf's complaint had not properly alleged it. *Sugarloaf Citizens Ass'n v. Gudis*, 78 Md.App. 550, 555 n. 2, 554 A.2d 434, 436 n. 2 (1989). If that was the problem, the remedy would be to allow amendment of the complaint, not to dismiss it. *Quality Disc. Tires v. Firestone Tire*, 282 Md. 7, 29, 382 A.2d

In any event, we shall assume, *arguendo,* that Sugarloaf has common law standing to bring this action, that the county ethics law does not preempt a common law action of the kind asserted here,[7] and that the action is barred neither by the doctrine of primary jurisdiction nor by the doctrine of exhaustion of administrative remedies.[8] Nevertheless, Sugarloaf cannot prevail. The unconstitutionality of § 19A–22(b) compels us to reach that result.[9]

### III.

### A.

 Section 19A–22(b), as we have seen, purports to authorize a court to

> void an official action taken by an official or employee with a conflict of interest prohibited by [the Montgomery County ethics law] when the action arose from or concerned the subject matter of the conflict ... *if the court deems voiding the action to be in the best ... interest of the public* [emphasis supplied].

That provision impermissibly attempts to vest in the court a nonjudicial power.

Courts can invalidate legislation on grounds of unconstitutionality. *City of Baltimore v. State,* 281 Md. 217, 230, 378 A.2d 1326, 1333 (1977) ("Absent some constitutional infirmity, a court has no power to declare void an act of the

---

867, 879 (1978) ("amendments should be freely allowed to serve the ends of justice"). *See also Cherry v. Brothers,* 306 Md. 84, 92, 507 A.2d 613, 617 (1986).

**7.** We need not decide whether a chartered county may preempt a common law cause of action. *See* n. 5, *supra.*

**8.** These assumptions make it unnecessary for us to examine the Court of Special Appeals' pronouncements about standing or the effect of the doctrine of primary jurisdiction. Our abstention should not be construed as approval of those pronouncements.

**9.** Like this Court in *Duffy v. Conaway,* 295 Md. 242, 254, 455 A.2d 955, 960, 961 (1983), and *Beasly v. Ridout,* 94 Md. 641, 648, 52 A. 61, 66 (1902), we raise this constitutional issue *nostra sponte.*

General Assembly."). Certain local action may be invalidated if the enacting body failed to comply with enabling legislation requirements or otherwise acted *ultra vires.* *See, e.g., Walker v. Talbot County,* 208 Md. 72, 86, 116 A.2d 393, 401, *cert. denied,* 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792 (1955) ("The cases spell out the necessity of substantially complying with legislative procedural and substantive prerequisites as to notice and hearings if the action of zoning authorities is to be valid."). But courts cannot so act because a judge thinks that to void the legislation is in some fashion "in the best ... interest of the public." To permit a court to act on that basis is to permit it to perform a nonjudicial function.

Article 8 of the Maryland Declaration of Rights is explicit:

> [T]he Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

Long ago we explained that

> [t]he evident purpose of the declaration is to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority. That is to say, such of them as are judicial in their character to the judiciary; such as are legislative to the legislature, and such as are executive in their nature to the executive.

*Wright v. Wright's Lessee,* 2 Md. 429, 452–453 (1852). We have repeatedly held that "Article 8 prohibits the courts from performing nonjudicial functions." *Reyes v. Prince George's County,* 281 Md. 279, 295, 380 A.2d 12, 21 (1977); *see, e.g., Duffy v. Conaway,* 295 Md. 242, 254, 455 A.2d 955, 961 (1983) ("[A] court has no jurisdiction to perform a nonjudicial function, and any enactment which attempts to confer such a function on a court is unconstitutional.").

We have never formulated a precise definition of "judicial function," but a number of our precedents give guidance that helps us apply the phrase in this case. In *Beasly v. Ridout*, 94 Md. 641, 52 A. 61 (1902), for example, a statute directed the judges of the Fifth Judicial Circuit to appoint three members of the Board of Visitors for the Anne Arundel County jail. Obviously, that act required the judges to exercise a sort of political discretion, not limited by standards or rules normally applied by courts in the exercise of their usual judicial functions. The Court held the statute to be unconstitutional because it converted the judges into an "appointing agency" and thus imposed upon them nonjudicial functions. 94 Md. at 658–659, 52 A. at 66.

The statute in *Close v. Southern Md. Agr. Assoc.*, 134 Md. 629, 108 A. 209 (1919), allowed a person to apply to a circuit court for a pari-mutual betting license. The court was instructed to review the application and grant or deny the license. That, too, was held to violate the separation of powers doctrine. The court noted that unlike the issuance of injunctions or the protection of rights of children, both accomplished under settled principles of law "peculiarly within the province of courts of equity," license-issuing was not within the "ordinary or recognized powers" of circuit courts. 134 Md. at 642, 108 A. at 214. "Surely, the Court, if acting judicially, cannot be governed by the individual views of the judges as to betting, or pool-selling or book-making on horse races." *Id.*

Even more significantly, the *Close* Court expressed concern about the exercise of legislative powers by the judiciary. Section 217 of the Maryland Code (1914), Article 27, made it a misdemeanor for one to do what the pari-mutual betting license would have permitted. Thus, the issuance of a license by a court would amount to an exemption from the operation of § 217. Our predecessors thought that this would be legislation by the court. They explained that

[i]t is for the Legislature, and not for the courts to pass statutes, and yet this statute undertakes to authorize the courts to exempt those who commit the acts on the

grounds of agricultural associations, etc., by granting them licenses. Such exemptions from the operation of statutes must be by legislative and not judicial action. 134 Md. at 644, 108 A. at 215.

An even clearer condemnation of an attempt to delegate unfettered political discretion to the judiciary is seen in *Cromwell v. Jackson*, 188 Md. 8, 52 A.2d 79 (1947). In that case, a statute authorized the Circuit Court for Allegany County to issue liquor licenses. In doing so, the court had to answer a number of questions, among which were:

7. Whether the applicant is a fit person to have a license to sell alcoholic beverages?

8. Whether the place for which the license is applied is a proper one with reference to the public peace and general welfare of the neighborhood or to the character of the inhabitants?

9. Proper allocation of licenses so as not to exceed one to every fifteen hundred persons.

10. What is a bona-fide entertainment held by any club, society, or association, for a special license?

188 Md. at 25–26, 52 A.2d at 87–88.

The Court held that "question" 9 required, in effect, the making of the sort of appointments found unconstitutional in *Beasly v. Ridout, supra. Cromwell*, 188 Md. at 27–28, 52 A.2d at 89. It explained that even if the court were able to determine who was fit to serve alcoholic beverages, it then would have no guidance for selecting from among "people equally fit, which one is to have the privilege." *Id.* at 27, 52 A.2d at 89. As to question 7, it rejected the notion that deciding who was fit to receive a liquor license was no different from deciding who was fit to have custody of an infant. In the latter case, "the principle of law is firmly established and a definite guide given that in all cases involving the custody of infants, the welfare of the infant is the primary consideration...." *Id.* at 26, 52 A.2d at 88. But

"[w]hether a person is a fit person to have a license to sell alcoholic beverages is a question of public policy or expediency depending upon many matters.... It is not a judicial question."

*Id.* [citation omitted].

The Court considered the difference between legislative and judicial discretion. It quoted *Mitchell v. Wright,* 154 F.2d 924, 928 (5th Cir.), *cert. denied,* 329 U.S. 733, 67 S.Ct. 96, 91 L.Ed. 633–634 (1946), to this effect:

We have several elements with which we may distinguish legislative and judicial functions, to wit: the element of futurity or retrospect, that of generality or particularity, that of discretion, and that of initiation. A good example of the element of discretion is the determination of a legislative body on the basis of public interest.... One must be careful ... not to confuse this legislative discretion with judicial discretion.

*Cromwell,* 188 Md. at 24, 52 A.2d at 87.

■ Section 19A–22(b) of the Montgomery County Code purports to. allow a court to void legislation (or other local governmental action) because the court concludes that to do so would be in the best interest of the public. As our cases demonstrate, that sort of unguided discretion, involving, as it does, questions of policy and expediency, is legislative, not judicial, discretion. It is the sort of discretion that may not, consistent with Article 8 of the Declaration of Rights, be vested in a court.

■ The Montgomery County Charter, however, lacks any separation of powers provision similar to Article 8. And we have said in the past that the constitutional concept of separation of powers does not apply to local government. *Barranca v. Prince George's Co.,* 264 Md. 562, 571, 287 A.2d 286, 291 (1972) (power of removal of Prince George's County commissioner lies in hands of both the county executive and the county council); *Pressman v. D'Alesandro,* 193 Md. 672, 679, 69 A.2d 453, 454 (1949). Nevertheless, § 19A–22(b) is invalid.

As we have shown, the General Assembly could not validly confer on a court the power to void legislation because the court thinks it is in the public interest to do so.[10] Montgomery County in this case exercised legislative powers pursuant to Article XI-A of the Maryland Constitution, as implemented by the Express Powers Act. Md.Code (1957, 1987 Repl.Vol.), Art. 25A. The adoption of ethics legislation by counties was mandated by Article 40A, §§ 6-101(a), 6-201(a), and 6-301. Section 6-401 expressly augmented the Express Powers Act to that end. But that mandate and that augmentation could not transcend the constitutional limits on the legislative powers of chartered counties.

 Article XI-A, the Home Rule Amendment, was intended "to transfer the General Assembly's power to enact many types of county public local laws to the Article XI-A home rule counties." *McCrory Corp. v. Fowler*, 319 Md. 12, 16, 570 A.2d 834, 835-836 (1990). *See also, e.g., Bd. of Election Laws v. Talbot County*, 316 Md. 332, 344, 558 A.2d 724, 730 (1989); *Griffith v. Wakefield*, 298 Md. 381, 384, 470 A.2d 345, 347 (1984); *Town of Forest Heights v. Frank*, 291 Md. 331, 341-342, 435 A.2d 425, 431 (1981); *Cheeks v. Cedlair Corp.*, 287 Md. 595, 597, 415 A.2d 255, 256 (1980). But powers the General Assembly does not itself possess cannot be transferred to or shared with counties. Since the General Assembly cannot confer nonjudicial powers on a court, neither can a chartered county. As a consequence, § 19A-22(b) is unconstitutional.

## B.

 We further hold, however, that § 19A-22(b) is severable from the remainder of the county ethics law.

Whether a provision like § 19A-22(b) is severable from the remaining portions of the statute of which it is a part is

---

**10.** We adverted to this problem in *Porten Sullivan Corp. v. State*, 318 Md. 387, 392 n. 3, 568 A.2d 1111, 1113 n. 3 (1990), but did not need to address it in that case.

a question of legislative intent. *Porten Sullivan Corp. v. State*, 318 Md. 387, 410, 568 A.2d 1111, 1122 (1990). In that regard, there is a "strong presumption 'that a legislative body generally intends its enactments to be severed if possible.'" *State v. Burning Tree Club, Inc.*, 315 Md. 254, 297, 554 A.2d 366, 387 (quoting *O.C. Taxpayers v. Ocean City*, 280 Md. 585, 600, 375 A.2d 541, 550 (1977)), *cert. denied*, — U.S. —, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989).[11] The ultimate test is intent, and more specifically, "what would have been the intent of the legislative body, if it had known that the statute could be only partially effective." *Turner v. State*, 299 Md. 565, 576, 474 A.2d 1297, 1302 (1984).

The Montgomery County Ethics Law was adopted pursuant to a mandate of the General Assembly, which obviously was deeply concerned about assuring ethical conduct by officials and employees of political subdivisions. *See* Md.Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Art. 40A, §§ 6–101, 6–201, 6–301. It was adopted by a county council that expressed its legislative findings and statement of policy in § 19A–2 of the county code:

(a) The county council of Montgomery County, recognizing that our system of government is dependent in part upon the people maintaining the highest trust in their public officials and employees, finds and declares that the people have a right to be assured that the impartiality and independent judgment of public officials and employees will be maintained.

(b) It is evident that this confidence and trust is eroded when the conduct of the business of Montgomery County

---

11. The ethics law, as adopted by Montgomery County, contained an uncodified saving clause favoring severability. The county code itself includes a similar provision in § 1–102(a). But a severability clause of this sort adds little to the basic presumption of severability, for such a "clause is merely declaratory of an established rule of construction; it is an aid merely, not an inexorable command." *Anne Arundel County v. Moushabek*, 269 Md. 419, 428, 306 A.2d 517, 522 (1973) (quoting *Sanza v. Md. Board of Censors*, 245 Md. 319, 338, 226 A.2d 317, 327 (1967)).

is subject to improper influence and even the appearance of improper influence.

(c) For the purpose of guarding against improper influence, the county council enacts this public ethics law to require public officials and employees to disclose their financial affairs and to set minimum standards for the conduct of county business.

(d) It is the intention of the county council that this chapter, except its provisions for criminal sanctions, be liberally construed to accomplish this purpose, and that these provisions shall in all respects be consistent with, and no less stringent than, the standards and requirements of the Maryland public ethics law, article 40A, of the Maryland Annotated Code.

This language is much like that contained in Maryland Code, Article 40A, § 1–102. That section has been read as manifesting "the General Assembly's strong desire to assure the impartiality and independent judgment of public officials." 66 Op. Att'y Gen. 197, 202 (1981). The Montgomery County Ethics Law can mean no less.

Like Article 40A, the county ethics law deals not only with conflicts of interest (§§ 19A–7 through 19A–11) but also with financial disclosure (§§ 19A–12 through 19A–15) and lobbying disclosure (§§ 19A–16 through 19A–21). Its dominant purpose is to lay down strong standards for ethical conduct by its officers and employees and for lobbyists—standards that will bind those individuals in their conduct, and standards that can be enforced. We do not believe, however, that any particular enforcement mechanism is closely intertwined with that dominant purpose. " '[W]hen the dominant purpose of a statute may largely be carried out notwithstanding the invalid provision, courts will ordinarily sever the statute and enforce the valid portion.' " *Burning Tree Club, Inc.*, 315 Md. at 297, 554 A.2d at 387–388 (quoting *Davis v. State*, 294 Md. 370, 384, 451 A.2d 107, 114 (1982)).

The Montgomery County Ethics Law provides for various means of administration and enforcement: advisory opinions from the ethics commission (§ 19A–5(d)); complaints to and investigations by that commission (§ 19A–5(e)); the waiver procedures of § 19A–6; the injunction and voiding provisions of § 19A–22; and penal, civil recovery, and personnel disciplinary actions in §§ 19A–23 through 19A–27. There is no hint that if one of those mechanisms should be held unconstitutional, the entire ethics law (or even § 19A–7(a)) must go down with it. This is especially true of the remedy sought to be provided by § 19A–22(b)—a sort of add-on to the injunction remedy of § 19A–22(a), and relief which in no event can be sought by anyone but the commission or the county attorney.

The case before us is not like *Burning Tree Club v. Bainum,* 305 Md. 53, 82, 501 A.2d 817, 831 (1985), which involved the "exception to a prohibition" rule, under which there is no presumption of severability. *See also, e.g., Turner v. State, supra; State v. Schuller,* 280 Md. 305, 372 A.2d 1076 (1977). It is not a case like *Shell Oil Co. v. Supervisor,* 276 Md. 36, 48, 343 A.2d 521, 528 (1975), in which an invalid appeal provision, if severed, would have left no effective means of appealing decisions of the Maryland Tax Court. It is not like *Police Comm'r v. Siegel, Enterprises, Inc.,* 223 Md. 110, 133, 162 A.2d 727, 738 (1959), *cert. denied,* 364 U.S. 909, 81 S.Ct. 273, 5 L.Ed.2d 225 (1960), in which the invalid provisions were "inextricably mingled" with valid ones. Nor is it like *Baltimore v. O'Conor,* 147 Md. 639, 654, 128 A. 759, 764 (1925), where the two sets of provisions were "inseparably connected in substance."

Surely in this case it cannot be said that "the valid portions of the ordinance are impractical and useless without the invalid portions." *Heubeck v. City of Baltimore,* 205 Md. 203, 212, 107 A.2d 99, 104 (1954). In the case before us, the valid provisions are both practical and useful even though a court cannot declare an errant official's action void because a judge thinks voiding the action would

"be in the best ... interest of the public." Administration and enforcement via the ethics commission, injunctions, penalties, and the like all remain.

In short, it seems to us that the Montgomery County Council, had it been advised of the invalidity of § 19A–22(b), would, nevertheless, have proceeded to adopt the rest of the ethics law, including § 19A–7(a). *See, e.g., Porten Sullivan, supra; State v. Burning Tree Club, supra; Cities Service Co. v. Governor,* 290 Md. 553, 431 A.2d 663 (1981); *O.C. Taxpayers v. Ocean City, supra; Barry Properties v. Fick Bros.,* 277 Md. 15, 353 A.2d 222 (1976); *Anne Arundel County v. Moushabek,* 269 Md. 419, 306 A.2d 517 (1973); *Sanza v. Md. Board of Censors,* 245 Md. 319, 226 A.2d 317 (1967); *Clark's Park v. Hranicka,* 246 Md. 178, 227 A.2d 726 (1967); *Culp v. Comrs. of Chestertown,* 154 Md. 620, 141 A. 410 (1928). Section 19A–22(b) is severable from the remainder of the ethics law.

## IV.

Because § 19A–22(b) is severable, § 19A–7(a)—the heart of the conflict-of-interest portion of the ethics law—remains as a valid part of that law. But it cannot be invoked as the basis for invalidating the siting resolution and Resolution No. 11–382. If we assume the invalidity of Gudis's waiver (and Sugarloaf argues forcefully for that result, because, among other reasons, the facts upon which the waiver was based were not the facts that existed at the time of Gudis's votes), the case is in this posture: Sugarloaf seeks to strike down legislative action, but is now deprived of the statutory provision authorizing a court to grant that relief. While we have assumed that Sugarloaf has Maryland common law standing to bring this action, there is ordinarily no common law remedy that permits invalidation of legislative action because of a legislator's improper motivation. Courts usually do not inquire into legislative motivation as a basis for setting aside legislation. *See, e.g., Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450,

466 n. 18 (1977); *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 551, 69 S.Ct. 1221, 1228, 93 L.Ed. 1528, 1538–1539 (1949); *Soon Hing v. Crowley*, 113 U.S. 703, 710–711, 5 S.Ct. 730, 734–735, 28 L.Ed. 1145, 1147 (1885); *Fletcher v. Peck*, 6 Cranch 87, 130, 3 L.Ed. 162, 176 (1810); *Hamilton, Superintendent v. Verdow*, 287 Md. 544, 556, 414 A.2d 914, 921 (1980); *County Council v. District Land*, 274 Md. 691, 704, 337 A.2d 712, 720 (1975); *People v. Gardner*, 143 Mich. 104, 106, 106 N.W. 541, 542 (1906); *Blankenship v. City of Richmond*, 188 Va. 97, 103, 49 S.E.2d 321, 323 (1948).

The common-law rule against inquiry into legislative motivation indicates that at common law stock ownership or a similar conflict of interest on the part of a legislator ordinarily would not be a basis for striking down a statute for which the legislator had voted. That rule seems to apply to truly legislative action. *Angle v. Chicago, St. Paul & Co. Railway*, 151 U.S. 1, 18–19, 14 S.Ct. 240, 246–247, 38 L.Ed. 55, 64 (1894); *Schauer v. City of Miami Beach*, 112 So.2d 838 (Fla.1959); *Coffin v. City of Lee's Summit*, 357 S.W.2d 211 (Mo.App.1962); *Blankenship, supra;* Recent Decisions, 57 Mich.L.Rev. 423 (1959). No one suggests that the votes here were anything other than legislative action, and in the absence of argument on the question, we decline to explore it.[12]

 In a sense, of course, Sugarloaf does not ask us to look at legislative motivation. It asks us to invalidate the votes because (if the waiver is invalid), § 19A–7(a) declares

---

**12.** There are cases that hold that stock ownership may be a disqualifying factor, even in the absence of statute, if the action in question is "quasi-judicial" in nature. *See, e.g., State ex rel. West Jersey Traction Co. v. Board of Public Works*, 56 N.J.L. 431, 29 A. 163 (1894), *aff'd*, 57 N.J.L. 710, 34 A. 1134 (1895); *Piggott v. Borough of Hopewell*, 22 N.J.Super. 106, 91 A.2d 667 (1952). These cases, like some of those cited in the text to which this note is appended, carefully distinguish between legislative action and "quasi-judicial" or executive action, such as letting a contract by ordinance, granting a franchise by ordinance, etc. *See* Annotation, 133 A.L.R. 1257, 1258 (1941). For purposes of our decision in this case, we assume, as the parties appear to do, that Gudis's votes were cast in connection with legislative actions.

Gudis to have been disqualified from voting. In some circumstances, courts of other states have done what Sugarloaf seeks, *see, e.g., S & L Associates, Inc. v. Twp. of Washington,* 35 N.J. 224, 172 A.2d 657 (1961); *Baker v. Marley,* 8 N.Y.2d 365, 208 N.Y.S.2d 449, 170 N.E.2d 900 (1960), although, *Baker,* at least, may not have involved true legislative action, *see* n. 12, *supra.* But despite the dictum in *Beshore v. Town of Bel Air,* 237 Md. 398, 408, 206 A.2d 678, 683 (1965) ("most, if not all, courts apply a strict rule in striking down enactments where one who participated is shown to have a conflicting interest"),[13] we do not believe that, under Maryland common law, mere ownership of stock by a legislator who cast a critical vote was a sufficient basis for the invalidation of true legislative action. That is one reason the General Assembly and the Montgomery County Council found it necessary to enact the conflict-of-interest provisions.

The enactment of § 19A–7(a) as part of the county ethics law does not disclose a legislative intent to create a new common law remedy, even if Montgomery County could do that. *See* n. 5, *supra.* On the contrary, the enforcement portion of the ethics law discloses an intent to permit enforcement only as permitted by §§ 19A–22 through 19A–27. The limited nature of the scope of enforcement contemplated by § 19A–22(a) is illustrated by the fact that any action thereunder must be initiated by direction of the commission or by the county attorney. And since § 19A–22(b) is unconstitutional, the remedy that might otherwise be afforded by it is unavailable.

---

**13.** The language quoted from *Beshore* is unsupported by citation to explicit authority. General references to authority in the paragraph in which the quoted language appears suggests that it may in fact be taken from cases involving the "quasi-judicial" or executive action circumstances discussed in n. 12, *supra.* Other Maryland cases are consistent with this analysis. *See, e.g., Gloyd v. Talbott,* 221 Md. 179, 156 A.2d 665 (1959); *Brenneman v. Roth,* 212 Md. 491, 130 A.2d 301 (1957).

In the absence of a common law remedy for the type of statutory conflict of interest involved here, and without the statutory remedy Sugarloaf has attempted to assert, a court has no basis for invalidating the legislative actions questioned here.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE–HALF BY PETITIONERS AND ONE–HALF BY RESPONDENTS.