Dear Mr. Steven B. Larsen
You have asked for our opinion concerning the effectiveness of a recent amendment of the law governing the conversion of a nonprofit health service plan to for-profit status. State law provides that such a transaction may be consummated only if the Insurance Commissioner ("Commissioner") finds that it is "in the public interest." Under a 2002 amendment to that law, sometimes referred to as the "anti-bonus provision", the Commissioner may not make the required finding if an officer of the nonprofit health service plan will receive special remuneration, other than compensation for continued employment, as a result of the transaction. You have asked whether you may apply the anti-bonus provision in considering an application for the conversion and acquisition of CareFirst, Inc. ("CareFirst") — an application that was initially filed prior to the addition of the anti-bonus provision to the State conversion law.
For the reasons set forth below, application of the anti-bonus provision to a transaction that was proposed prior to its enactment would not violate any State or federal constitutional rights of the parties to the proposed transaction. Thus, in our opinion, you should consider that provision in assessing whether the proposed CareFirst transaction is in the public interest.[1]
 I Conversion Law
In 1998, the General Assembly enacted a comprehensive statutory scheme to govern transactions that effect transfers of the assets or ownership of nonprofit health entities. Chapters 123, 124, Laws of Maryland 1998, codified at Annotated Code of Maryland, State Government Article ("SG"), 6.5-101 et seq. Among the transactions covered by this law are the conversion of a nonprofit health service plan to for-profit status and a sale or merger that transfers a plan's assets to a for-profit corporation. SG § 6.5-101(b).
Under this law, the Commissioner's approval is a prerequisite to a transaction involving a nonprofit health service plan. Specifically, the Commissioner must assess whether the transaction is "in the public interest." SG § 6.5-301(a). The law sets forth several criteria for that assessment. Among other things, the Commissioner is to determine whether steps have been taken to preserve public and charitable assets, whether the company exercised due diligence in negotiating the transaction, whether the transaction will have a significant adverse effect on health care services, and whether it is equitable to various stakeholders. SG §§ 6.5-301, 6.5-303(2).
Particularly pertinent to your question are two provisions designed to ensure that officers and directors of a nonprofit health service plan do not unfairly enrich themselves in connection with the transaction. These provisions are sometimes referred to as the "antiinurement" and "anti-bonus" provisions.
A. Anti-Inurement Provision
The conversion law provides that a transaction is not in the public interest unless
 appropriate steps have been taken to . . . ensure that no part of the public or charitable assets of the acquisition inure directly or indirectly to an officer, director, or trustee of a [nonprofit health service plan]. . .
SG § 6.5-301(b)(3). This provision was part of the conversion law when it was originally enacted in 1998. Chapters 123, 124, Laws of Maryland 1998.
B. Anti-Bonus Provision
The conversion law also provides that a transaction is not in the public interest unless:
 appropriate steps have been taken to . . . ensure that no officer, director, or trustee of the [nonprofit health service plan] receives any immediate or future remuneration as the result of an acquisition or proposed acquisition except in the form of compensation paid for continued employment with the acquiring entity.
SG § 6.5-301(b)(4). A parallel provision in the State insurance law[2] directly prohibits an officer, director, or trustee from receiving such remuneration. Annotated Code of Maryland, Insurance Article ("IN"), § 14-139(b). Both of these provisions were the result of legislation enacted in 2002. Chapter 154, Laws of Maryland 2002.
 II The Transaction
A. Conversion and Merger of CareFirst
CareFirst, as well as certain of its subsidiaries, is licensed as a nonprofit health service plan in Maryland. See 87 Opinions of the Attorney General ___ (2002) [Opinion No. 02-019 (November 12, 2002)] ("2002 Attorney General Opinion"), slip op. at pp. 2-3. In November 2001, CareFirst entered into an agreement with WellPoint Health Networks, Inc. ("WellPoint") that sets forth what is essentially a two-step transaction: (1) the conversion of CareFirst and its subsidiaries to for-profit entities; and (2) the merger of a wholly-owned subsidiary of WellPoint with CareFirst and its subsidiaries. 2002 Attorney General Opinion at p. 3. This transaction fits the definition of an acquisition subject to the review and approval of the Commissioner under the conversion law. SG § 6.5-101(b), (g)(2), (j)(2). CareFirst and WellPoint filed an application seeking the Commissioner's approval on January 11, 2002.
B. Executive Bonus Provisions
CareFirst has entered into agreements with a number of its executives that provide special compensation to those executives in connection with a "change of control" of CareFirst.
1. Employment Agreement Provisions (1998-2000)
Between November 1998 and December 2000, CareFirst entered into employment agreements with its President and Chief Executive Officer and seven other high-ranking executives. Under those employment agreements, a "change of control" of CareFirst triggers special payments and benefits for those executives if certain conditions are met.
The payments are calculated as percentages of each executive's base salary, annual incentive bonus, and long-term incentive plan bonus. Other special benefits include supplemental health, insurance, and pension benefits, and the company's payment of an excise tax that would be assessed on the executives under an "excess parachute payments" provision of the Internal Revenue Code.
The employment agreements define the phrase "change of control" to cover a range of transactions or changes in the board of the company.[3]
While not every "change of control" would be subject to the Commissioner's approval under the State conversion law, there appears to be no question that the proposed CareFirst transaction satisfies both the definition of "change of control" in the employment agreements and the definition of an "acquisition" subject to the Commissioner's approval under the conversion law.
2. Merger Incentive Plan (2001)
In December 2001, CareFirst also adopted a "merger incentive plan," which authorized additional bonuses totaling approximately $25 million for the Chief Executive Officer and six other executives contingent upon a "sale or disposition" of the company and fulfillment of certain other conditions. That plan defined "sale or disposition" in terms similar to "change of control" in the employment agreements.[4] At the same time, CareFirst created a "retention bonus plan" that provided for bonuses for various other executives upon the same contingency.
C. Consultant's Report
The Commissioner retained the law firm of Roger G. Brown 
Associates to analyze the bonus provisions of the employment agreements, the merger incentive plan, and the retention bonus plan. The consultant concluded that the additional compensation to CareFirst executives that would be triggered by the transaction would violate both the anti-inurement and anti-bonus provisions of the conversion law. See Draft Report on CareFirst, Inc. Executive Compensation including Compensation in Connection with a Change of Control (November 7, 2002). CareFirst submitted rebuttal testimony to contest that conclusion.
For purposes of this opinion, we need not determine the merits of the consultant's conclusion, but will assume that the employment agreements and merger incentive plan would involve bonuses contrary to the anti-inurement and anti-bonus provisions and thus entail a finding that the transaction, as originally proposed,[5] is not in the public interest.
You have asked whether the Commissioner may constitutionally apply the anti-bonus provision in determining whether the CareFirst transaction is in the public interest, even though that provision was added to the conversion law after the original conversion application was filed.
 III Analysis
To answer your inquiry we must determine (1) whether the General Assembly intended that the anti-bonus provision apply to a conversion application pending at the time of its enactment in 2002, and (2) assuming that the General Assembly had such intent, whether the State and federal constitutions prevent that intent from being given effect.
A. Prospective or Retrospective Application of a Statute
As a general rule, a statute is presumed to operate prospectively unless the Legislature intends that the statute operate retrospectively. Langston v. Riffe, 359 Md. 396, 406, 754 A.2d 389 (2000); Waters Landing Limited Partnership v. Montgomery County, 337 Md. 15, 28, 650 A.2d 712
(1994). A "retrospective" or "retroactive" application of a statute "operate[s] on transactions which have occurred or rights and obligations which existed before passage of the act." Langston, 319 Md. at 406
(quoting 2 Singer, Sutherland's Statutory Construction § 41.01). A statute that simply imposes new requirements . . . when someone performs an act or event after the effective date is to be classified as prospective." 83 Opinions of the Attorney General ___ (1998) [Opinion No. 98-014 (May 28, 1998)], slip op. at p. 2. Classification of a statute as prospective or retrospective can be a matter of some debate. See 80 Opinions of the Attorney General 278, 280-81 (1995).
There are exceptions to the presumption of prospectivity for statutes that are procedural or remedial in nature. Langston, 359 Md. at 406-9. Remedial statutes "are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries . . . . The statutes which fall into this category . . . are ones that describe methods of enforcing, processing, administering or determining rights, liabilities and status." Id. at 409 (quoting 3 Singer, Sutherland's Statutory Construction §§ 60.02, 41.09.) To fall within this category, a statute must not interfere with substantive or "vested" rights. Id.
B. Constitutional Considerations
1. Protection of Vested Rights under Maryland Constitution
Even when it is clear that the Legislature intends that a statute operate retroactively, the validity of the statute under the State Constitution will turn on whether it interferes with "vested" rights. In Dua v. Comcast Cable of Maryland, Inc., 370 Md. 604, 805 A.2d 1061
(2002), the Court of Appeals recently discussed the constitutionality of legislative enactments that were clearly intended to have retrospective application.[6] Ruling that the two statutes in question should not be given retrospective effect, the Court held that "the Constitution of Maryland prohibits legislation which retroactively abrogates vested rights." 370 Md. at 623. The Court traced the source of that prohibition to the right to due process of law embodied in Articles 19 and 24 of the Declaration of Rights,[7] and the proscription against the uncompensated taking of property in Article III, § 40 of the State Constitution.[8] Id. at 628-29. The Court stated:
 A statute having the effect of abrogating a vested property right, and not providing for compensation, does "authoriz[e] private property, to be taken . . ., without just compensation" (Article III, § 40). Concomitantly, such a statute results in a person or entity being "deprived of his . . . property" contrary to "the law of the land" (Article 24).
Id. at 630
Thus, under the Maryland Constitution, a statute may operate retroactively only if it does not impair a vested right.[9] Id. at 629. In the cases before it, the Court held that an accrued cause of action, whether based in statute or common law, is a vested right for purposes of this analysis. Id. at 632-38. The Court acknowledged that there ordinarily would be no vested right in a cause of action that accrues after a statute limits or abrogates the cause of action. Id. at 632-33.
2. Contract Clause of the United States Constitution
Under the United States Constitution, a state may not enact "any . . . Law impairing the Obligation of Contracts." U.S. Constitution, Article I, § 10. The Contract Clause is not an absolute prohibition against impairment of contractual obligations. In particular, the Contract Clause does not prevent a state from exercising its police powers. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241-42 (1978). In order for retroactive legislation to violate the Contract Clause, there must at the very least be a substantial impairment of a contractual relationship. General Motors Corp. v. Romein, 503 U.S. 181, 186-87
(1992). Even if there is a substantial impairment, retroactive application of a statute will survive scrutiny under the Contract Clause if the measure is reasonable and necessary to serve an important public purpose. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470,502-6 (1987); United States Trust Co. v. New Jersey, 431 U.S. 1, 26
(1977). See generally MSTA v. Hughes, 594 F. Supp. 1353, 1359-61 (D.Md. 1984).
Courts are less inclined to find an impairment of contract when legislation affects a business that is already subject to substantial regulation. Energy Reserves Group, Inc. v. Kansas Power Light Co.,459 U.S. 400, 413-14 (1983); Chevy Chase Savings Loan, Inc. v. State, 306 Md. 384, 412, 509 A.2d 670 (1986). As Justice Holmes stated, "[o]ne whose rights, such as they are, are subject to state regulation, cannot remove them from the power of the state by making a contract about them." Hudson County Water Co. v. McCarter, 209 U.S. 349, 357 (1908). This is particularly true if the subsequent amendments are designed to buttress an existing legislative goal or constitutional right. FHA v. The Darlington, Inc. 358 U.S. 84, 91 (1958); State v. Burning Tree Club, Inc., 315 Md. 254, 268-71, 554 A.2d 366 (1989).
C. The 2002 Amendment of the Conversion Law
1. Legislative Intent
The 2002 enactment that added the anti-bonus provision to the conversion law did not purport to act retrospectively. The effective date of that provision was June 1, 2002. Chapter 154, § 2, Laws of Maryland 2002. However, because the CareFirst transaction was pending at the time of the 2002 amendment of the conversion law, the anti-bonus provision may apply even if the Legislature intended that it operate prospectively.[10]
In any event, when it passed the 2002 legislation, the Legislature clearly contemplated that anti-bonus provision would apply to the proposed acquisition of CareFirst by WellPoint. The extent of the bonuses to be received by CareFirst executives on consummation of the transaction became public in early March 2002 and drew immediate controversy. See, e.g., Jews' Golden Chute Glitters, Baltimore Sun (March 9, 2002), at p. 11C; CareFirst to Make Case This Week . . . Criticism is Growing, Baltimore Sun (March 10, 2002), at p. 1C. Shortly thereafter, the Chair of the Senate Finance Committee, which was considering amendments to the conversion law, requested advice concerning application of those provisions to the pending CareFirst transaction. See Letters of Assistant Attorney General Robert A. Zarnoch to Senator Thomas L. Bromwell (March 20 and March 22, 2002). Other materials in the legislative file indicate that the Legislature understood that the amendments would apply to the proposed, but not yet completed, transaction. See, e.g., Fiscal Note to House Bill 1254 (2002). Moreover, it is evident that the Legislature considered this law a remedial measure to support the public interest standard that it had previously established in the conversion law.
2. Vested Rights Analysis
Assuming for the sake of argument that application of the anti-bonus provision to the proposed CareFirst transaction would be a retrospective application of the 2002 amendment,[11] we do not believe that it would impair or abrogate a vested right of CareFirst or WellPoint.
The anti-bonus provision in the conversion law bears on the Commissioner's approval of the proposed transaction. It affects CareFirst's ability to convert to for-profit status and the ability of CareFirst and WellPoint to consummate their merger agreement. Did the companies have a "vested" right in approval of the proposed transaction at the time the anti-bonus provision was added to the conversion law?
Undoubtedly, they did not. The proposed transaction was, and remains, subject to a number of contingencies, including a finding by the Commissioner that it is in the public interest. Even if one believed that the Commissioner's approval was inevitable under the conversion law as it existed at the time the application was filed, it would be incongruous to say that either company had a "vested" right in a decision entrusted to the discretion of the Commissioner.[12] In addition, the transaction is contingent on other future occurrences, including approvals by regulators in other jurisdictions. See Agreement and Plan of Merger § 7.1 (November 20, 2001). In light of these contingencies, neither CareFirst nor WellPoint had a "vested" right that would insulate the proposal from legislation. See Powell v. Calvert County, 368 Md. 400, 795 A.2d 96
(2002) (change in zoning law applied to landowner's application for special exception because landowner had no "vested" right in exception until all approvals had been obtained); see also Chevy Chase Savings Loan, Inc. v. State, 306 Md. 384, 400, 509 A.2d 670 (1986) (savings and loan did not have "vested" right to return of contributions to insurance fund upon notice of withdrawal from fund as various conditions remained to terminate the relationship and compute the sum owed); State v. State Board of Contract Appeals, 364 Md. 446, 459, 773 A.2d 504 (2001) (contingent fee contract did not create immediate property right). The fact that the 2002 legislation may prevent fulfillment of a contingency does not mean that the Legislature has deprived either company of a vested right.
If a transaction, resulting in a "change of control"of CareFirst and triggering executive bonuses, had been approved before enactment of the 2002 amendment, perhaps it could be said that CareFirst and WellPoint had an existing "vested" right in that approval that could not be upset by legislation. However, the 2002 legislation did not retroactively take a vested right; instead, it may have precluded any rights from vesting in the future.
3. Contract Clause Analysis
In our opinion, application of the anti-bonus provision would not impair any contract rights of WellPoint or CareFirst. Nonprofit health service plans have been highly regulated for many years. In addition to being subject to much the same regulation as other insurers, State law includes special restrictions for nonprofit health service plans. For example, several laws restrict the conversion or sale of such a plan. See 2002 Attorney General Opinion.
The anti-bonus provision did not depart from existing regulatory standards for nonprofit health service plans. The anti-bonus provision is simply a further articulation of the public interest standard in the conversion law governing the Commissioner's approval at the time that CareFirst and WellPoint entered into their agreement. Indeed, at that time, the conversion law already contained the anti-inurement provision in which the General Assembly indicated that special compensation for officers, directors, and trustees would be a factor militating against the regulatory approval of a conversion application. Finally, like the anti-inurement provision, the anti-bonus provision is designed to prevent possible conflicts of interest that would undermine the policy — already expressed in the conversion law — of preserving the public and charitable assets of nonprofit health service plans for the benefit of the public.
 IV Conclusion
In our opinion, the Commissioner should consider the anti-bonus provision in assessing whether the proposed CareFirst transaction is in the public interest.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] Our conclusion with respect to the anti-bonus provision is consistent with the advice that this Office provided when that legislation was under consideration by the General Assembly. See Letter of Assistant Attorneys General Kathleen Hoke Dachille and Andrew H. Levine to Delegate Michael E. Busch (January 22, 2002); Letters of Assistant Attorney General Robert A. Zarnoch to Senator Thomas L. Bromwell (March 20 and March 22, 2002).
[2] Nonprofit health service plans like CareFirst are regulated under Title 14 of the Insurance Article.
[3] "Change of control" is defined as follows:
 (i) a merger, acquisition, consolidation or other transaction involving the Company after which the individuals who constituted members of the Board of Directors twelve (12) months before the consummation of such transaction do not constitute a majority of the Board of Directors or other similar governing body of the most senior resulting business entity after such transaction; or
 (ii) a sale, lease or exchange of more than 50% of the assets of the Company or of any of its subsidiaries, or more than 50% of the stock or other equity interests in any of the Company's subsidiaries, to one or more organizations or entities not more than 50% owned by the Company or the Affiliated Companies after the consummation of such transaction.
In addition, a Change in Control shall be deemed to have occurred if, during any period of twenty-four (24) consecutive months, individuals who at the beginning of such period constituted the Board cease for any reason to constitute at least a majority thereof unless the election of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the beginning of the twenty-four month period.
Notwithstanding the foregoing, a Change of Control shall in no event be deemed to have occurred if the Company is placed in receivership or under control of the Commissioner of Insurance with jurisdiction over the Company, and Executive shall not receive any severance pay under Section 8 of this Employment Agreement if any local, state, or federal regulator assumes control of the Company.
Employment Agreement of William L. Jews (November 24, 1998) at pp. 14-15.
[4] The phrase "sale or disposition" is defined as follows:
"Sale or Disposition" means the first of any of the following to occur:
 (i) a merger, acquisition, consolidation or other transaction involving the Company after which the individuals who constituted members of the Board twelve (12) months before the consummation of such transaction do not constitute a majority of the Board of other similar governing body of the most senior resulting business entity after such transaction; or
 (ii) a sale, lease or exchange of more than fifty percent (50%) of the assets of the Company and its subsidiaries to one or more organizations or entities not more than fifty percent (50%) owned by the Company after the consummation of such transaction;
 provided, however, that a Sale or Disposition shall in no event be deemed to have occurred if the Company is placed in receivership or under control of the Commissioner of Insurance with jurisdiction over the Company, and the Participants shall not receive any bonuses under this Plan if any local, state, or federal regulator assumes control of the Company.
CareFirst Merger Incentive Plan (December 2, 2001) at p 4.
[5] After you requested this opinion, CareFirst and WellPoint amended their application and also entered into an Amended and Restated Agreement and Plan of Merger. The new filing states that the amended agreement "eliminates the issues raised by the consultants . . . regarding the appropriateness and legality of the CareFirst compensation programs . . . ." Amendment No. 1 to Form A — Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (January 17, 2003). We do not address the merits of that assertion.
[6] Dua involved two laws passed in 2000 that each attempted to reverse the effect of a recent decision of the Court of Appeals. One law set forth detailed regulations governing late fees in consumer contracts and applied those provisions to all contracts in effect on or after November 5, 1995. The second law allowed a health maintenance organization (HMO) to be subrogated to a claim that the HMO's subscriber had against a negligent third party who had caused an injury requiring the subscriber to access health services through the HMO. That law was made applicable to all subrogation recoveries by HMOs since January 1, 1976.
[7] Article 19 provides:
 That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.
Article 24 provides:
 That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.
[8] Article III, § 40 provides:
 The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.
[9] This standard may be more stringent than the standard applied to assess retroactive legislation under the due process clause of the federal Constitution. See, e.g., Usery v. Turner Elkhorn Mining Co.,428 U.S. 1, 14-20 (1976) (legislation may operate retroactively if it rationally relates to a legitimate government purpose, even if it upsets "settled expectations"); United States v. Carlton, 512 U.S. 26, 30 (1994) (same). The Dua Court expressed no view on the application of the federal due process clause to the legislation in that case. Dua,370 Md. at 620.
[10] When it initially enacted the conversion law in 1998, the Legislature explicitly directed that the law apply prospectively, but apparently viewed application of the law to a pending transaction that had not yet been completed as a prospective application of the law. That law provided that "this Act shall be construed only prospectively and may not be applied or interpreted to have any effect on or application to any acquisition completed . . . before October 1, 1998." Chapter 123, § 2, Laws of Maryland 1998 (emphasis added).
[11] Of course, given the recent filing of an amended application and revised agreement between CareFirst and WellPoint, the Commissioner must now assess an agreement that was entered into after the effective date of the anti-bonus provision.
[12] It appears unlikely that a court would have authority to act on such a conclusion. For example, in Sugarloaf Citizens Ass'n, Inc. v. Gudis, 319 Md. 558, 572, 573 A.2d 1325 (1990), the Court of Appeals held that a county ordinance authorizing a court to void official action if the court found such action "in the best interest of the public" violated the constitutional separation of powers. "[T]hat sort of unguided discretion involving, as it does, questions of policy and expediency, is legislative, not judicial, discretion [and] may not . . . be vested in a court." Id. *Page 25