30 A.3d 267

Matthew C. BAKER, et al.

v.

MONTGOMERY COUNTY, Maryland, et al.

No. 1038, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Oct. 27, 2011.

**644**

Stephen H. Ring, Gaithersburg, MD (William F. Askinazi, Germantown, MD and Toby N. Byrd, Timothy P. Leahy, Joshua Winger, Byrd & Byrd, Bowie, MD), on the brief, for appellant.

Charles L. Frederick, Rockville, MD & Kevin Karpinski, Baltimore, MD (Marc P. Hansen, Co. Atty., Patricia P. Via, Division Chief, Rockville, MD and Sandra D. Lee, Karpinski, Colaresi & Karp, PA, Baltimore, MD), on the brief, for appellee.

Panel: ZARNOCH, GRAEFF and WATTS, JJ.

WATTS, J.

This appeal arises from the Circuit Court for Montgomery County's grant of summary judgment in favor of Montgomery County (the "County"), the Mayor and Council of Rockville ("Rockville"), the City of Gaithersburg ("Gaithersburg"), and Chevy Chase Village ("Chevy Chase"), appellees,[1] against Matthew C. Baker; Thomas J. Wheatley; Aristone L. Pereira, Jr.; Johnny R. Garza; Kenneth K. Sleeman; David A. Schiller; Walter McKee; Janet Marburger; and those similarly situated, collectively referred to as appellants. The lawsuit in this matter was initiated by appellants, all of whom received speeding citations resulting from photographs taken by speed monitoring systems located in appellees' respective jurisdictions. Appellants claim that appellees violated Md. Ann.Code.

---

1. Rockville, Gaithersburg, and Chevy Chase will be collectively referred to as the Municipalities throughout this opinion.

Transportation Article ("T.A.") § 21–809 by entering into contracts in which contingent fees were paid to ACS State & Local Solutions Inc., ("ACS"), the contractor who allegedly operated appellees' speed monitoring systems, and as such, the fines were unlawful.

Appellants raised the following issues, which we have rephrased and reordered [2] as follows:

I. Does a private cause of action exist for appellants to challenge appellees' alleged misapplication of T.A. § 21–809?

II. Does T.A. § 21–809 apply equally to the County and the Municipalities?

III. Were the contracts between appellees and ACS in violation of T.A. § 21–809?

---

2. Appellants phrased the issues thus:

I. Does the Statute, which refers to "speed monitoring systems in Montgomery County" and "The police department of any municipal corporation in Montgomery County," apply equally to the Municipalities and Montgomery County?

II. The General Assembly prohibited contingent fees to contractors, to avoid potential influence on the issuance of citations. The contractor here exercises wide control that can influence the issuance of citations. Have the Appellees' contracts with the contractor violated the Statute?

III. The contractor's determinations as to which citations are issued or rejected are almost never challenged by the Appellees. Does the formality of "final approval" by the Appellees render the contractor's role merely "mechanical and ministerial," and not that of a "contractor who operates"?

IV. The law contemplates a private cause of action to right the government's misapplication of statutes. The Statute provides no meaningful avenue for challenges to its validity. Is this private action permissible?

V. The Circuit Court ruled that Appellants waived their rights to challenge the Statute by paying the fines imposed under their citations. Nonpayment of the fines would likely result in additional fines and fees, and the possible suspension of vehicle registration. Did Appellants waive the right to challenge the Statute by paying their fines?

VI. The Local Government Tort Claims Act [ ("LGTCA") ] requires 180 day notice as to claims for unliquidated damages. The claims here are liquidated. Does the LGTCA notice requirement apply? If so, has it been met?

IV. Did appellants waive the right to challenge T.A. § 21–809 by paying the $40 citation fines?

V. Does the Local Government Torts Claims Act ("LGTCA") notice requirement apply in this case and, if so, did appellants comply?

We answer the first question in the negative and, as such, we need not address the other issues raised by appellants. We shall, therefore, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, the Maryland General Assembly passed House Bill ("H.B.") 443 and enacted T.A. § 21–809, granting Montgomery County authority to place speed cameras throughout the County and impose a civil penalty not to exceed $40.00 in the event of a violation of the subtitle. T.A. § 21–809 (2006)[3] provides:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Local police department" means:

(i) The Montgomery County Department of Police; and

(ii) The police department of any municipal corporation in Montgomery County.

(3)(i) "Owner" means the registered owner of a motor vehicle or a lessee of a motor vehicle under a lease of 6 months or more.

(ii) "Owner" does not include:

1. A motor vehicle rental or leasing company; or

2. A holder of a special registration plate issued under Title 13, Subtitle 9, Part III of this article.

(4) "Recorded image" means an image recorded by a speed monitoring system:

(i) On:

1. A photograph;

---

**3.** The 2006 version of T.A. § 21–809 was effective when appellants received speed citations pursuant to T.A. § 21–809.

2. A microphotograph;

3. An electronic image;

4. Videotape; or

5. Any other medium; and

(ii) Showing:

1. The rear of a motor vehicle;

2. At least two time-stamped images of the motor vehicle that include the same stationary object near the motor vehicle; and

3. On at least one image or portion of tape, clearly identifying the registration plate number of the motor vehicle.

(5) "Speed monitoring system" means a device with one or more motor vehicle sensors producing recorded images of motor vehicles traveling at speeds at least 10 miles per hour above the posted speed limit.

(6) "Speed monitoring system operator" means an individual who operates a speed monitoring system.

(b) *In general.*—(1) This section applies to a violation of this subtitle that occurs in Montgomery County recorded by a speed monitoring system that meets the requirements of this subsection and has been placed:

(i) On a highway in a residential district as defined in § 21–101 of this title:

1. With a maximum posted speed limit of 35 miles per hour; and

2. That has a speed limit that was established using generally accepted traffic engineering practices; or

(ii) In a school zone established under Section 21–803.1 of this subtitle.

(2)(i) A speed monitoring system operator shall complete training by a manufacturer of speed monitoring systems in the procedures for setting up and operating the speed monitoring system.

(ii) The manufacturer shall issue a signed certificate to the speed monitoring system operator upon completion of the training.

· (iii) The certificate of training shall be admitted as evidence in any court proceeding for a violation of this section.

(3) A speed monitoring system operator shall fill out and sign a daily set-up log for a speed monitoring system that:

(i) States that the speed monitoring system operator successfully performed the manufacturer-specified self-test of the speed monitoring system prior to producing a recorded image;

(ii) Shall be kept on file; and

(iii) Shall be admitted as evidence in any court proceeding for a violation of this section.

(4)(i) A speed monitoring system shall undergo an annual calibration check performed by an independent calibration laboratory.

(ii) The independent calibration laboratory shall issue a signed certificate of calibration after the annual calibration check, which:

1. Shall be kept on file; and

2. Shall be admitted as evidence in any court proceeding for a violation of this section.

(c) *Civil penalty.*—(1) Unless the driver of the motor vehicle received a citation from a police officer at the time of the violation, the owner or, in accordance with subsection (f)(4) of this section, the driver of a motor vehicle is subject to a civil penalty if the motor vehicle is recorded by a speed monitoring system while being operated in violation of this subtitle.

(2) A civil penalty under this subsection may not exceed $40.

(3) For purposes of this section, the District Court shall prescribe:

(i) A uniform citation form consistent with subsection (d)(1) of this section and § 7–302 of the Courts Article; and

(ii) A civil penalty, which shall be indicated on the citation, to be paid by persons who choose to prepay the civil penalty without appearing in District Court.

(d) *Citation.*—(1) Subject to the provisions of paragraphs (2) through (4) of this subsection, the local police department shall mail to the owner, liable under subsection (c) of this section, a citation that shall include:

(i) The name and address of the registered owner of the vehicle;

(ii) The registration number of the motor vehicle involved in the violation;

(iii) The violation charged;

(iv) The location where the violation occurred;

(v) The date and time of the violation;

(vi) A copy of the recorded image;

(vii) The amount of the civil penalty imposed and the date by which the civil penalty should be paid;

(viii) A signed statement by a duly authorized agent of the local police department that, based on inspection of recorded images, the motor vehicle was being operated in violation of this subtitle;

(ix) A statement that recorded images are evidence of a violation of this subtitle;

(x) Information advising the person alleged to be liable under this section of the manner and time in which liability as alleged in the citation may be contested in the District Court; and

(xi) Information advising the person alleged to be liable under this section that failure to pay the civil penalty or to contest liability in a timely manner:

1. Is an admission of liability;

2. May result in the refusal by the Administration to register the motor vehicle; and

3. May result in the suspension of the motor vehicle registration.

(2) The local police department may mail a warning notice instead of a citation to the owner liable under subsection (c) of this section.

(3) Except as provided in subsection (f)(4) of this section, the local police department may not mail a citation to a person who is not an owner.

(4) Except as provided in subsection (f)(4) of this section, a citation issued under this section shall be mailed no later than 2 weeks after the alleged violation if the vehicle is registered in this State, and 30 days after the alleged violation if the vehicle is registered in another state.

(5) A person who receives a citation under paragraph (1) of this subsection may:

(i) Pay the civil penalty, in accordance with instructions on the citation, directly to the Montgomery County Department of Finance; or

(ii) Elect to stand trial in the District Court for the alleged violation.

(e) *Evidence.*—(1) A certificate alleging that the violation of this subtitle occurred and the requirements under subsection (b) of this section have been satisfied, sworn to, or affirmed by a duly authorized agent of the local police department, based on inspection of recorded images produced by speed monitoring system, shall be evidence of the facts contained in the certificate and shall be admissible in a proceeding alleging a violation under this section without the presence or testimony of the speed monitoring system operator who performed the requirements under subsection (b) of this section.

(2) If a person who received a citation under subsection (d) of this section desires the speed monitoring system operator to be present and testify at trial, the person shall notify the court and the State in writing no later than 20 days before trial.

(3) Adjudication of liability shall be based on a preponderance of evidence.

(f) *Defenses.*—(1) The District Court may consider in defense of a violation:

(i) Subject to paragraph (2) of this subsection, that the motor vehicle or the registration plates of the motor vehicle were stolen before the violation occurred and were not under the control or possession of the owner at the time of the violation;

(ii) Subject to paragraph (3) of this subsection, evidence that the person named in the citation was not operating the vehicle at the time of the violation; and

(iii) Any other issues and evidence that the District Court deems pertinent.

(2) In order to demonstrate that the motor vehicle or the registration plates were stolen before the violation occurred and were not under the control or possession of the owner at the time of the violation, the owner shall submit proof that a police report regarding the stolen motor vehicle or registration plates was filed in a timely manner.

(3) To satisfy the evidentiary burden under paragraph (1)(ii) of this subsection, the person named in the citation shall provide to the District Court a letter, sworn to or affirmed by the person and mailed by certified mail, return receipt requested, that:

(i) States that the person named in the citation was not operating the vehicle at the time of the violation;

(ii) Provides the name, address, and, if possible, the driver's license identification number of the person who was operating the vehicle at the time of the violation; and

(iii) Includes any other corroborating evidence.

(4)(i) If the District Court finds that the person named in the citation was not operating the vehicle at the time of the violation or receives evidence under paragraph (3) of this subsection identifying the person driving the vehicle at the time of the violation, the clerk of the court shall provide to the local police department a copy of any evidence substan-

tiating who was operating the vehicle at the time of the violation.

(ii) On receipt of substantiating evidence from the District Court under subparagraph (i) of this paragraph, the local police department may issue a citation as provided in subsection (d) of this section to the person who the evidence indicates was operating the vehicle at the time of the violation.

(iii) A citation issued under subparagraph (ii) of this paragraph shall be mailed no later than 2 weeks after receipt of the evidence from the District Court.

(g) *Effect of failure to pay penalty.*—If a person liable under this section does not pay the civil penalty or contest the violation, the Administration:

(1) May refuse to register or reregister the motor vehicle cited for the violation; or

(2) May suspend the registration of the motor vehicle cited for the violation.

(h) *Nature of violation*—A violation for which a civil penalty is imposed under this section:

(1) Is not a moving violation for the purpose of assessing points under § 16–402 of this article;

(2) May not be recorded by the Administration on the driving record of the owner or driver of the vehicle;

(3) May be treated as a parking violation for purposes of § 26–305 of this article; and

(4) May not be considered in the provision of motor vehicle insurance coverage.

(i) *Chief judge to establish procedures for issuance of citations.*—In consultation with the Montgomery County Department of Finance and the local police departments, the Chief Judge of the District Court shall adopt procedures for the issuance of citations, the trial of civil violations, and the collection of civil penalties under this section.

(j) **Restrictions on contractor's fee.**—If a contractor operates a speed monitoring system on behalf of Montgom-

**ery County, the contractor's fee may not be contingent
on the number of citations issued or paid.**[4]

(Emphasis added).

Following the enactment of T.A. § 21–809, the County's
Department of Police proposed to implement a Photo Speed
Enforcement Program in the County. On August 3, 2006, the
County issued a Request for Proposal seeking a qualified
contractor to provide for the implementation, use, and servic-
ing of photo speed enforcement technology and services as
requested by the County. The County entered into a contract
with ACS. Pursuant to the contract, ACS was "compensated
... at a rate of $16.25 per paid citation or $18,000 per month
for the Program, whichever is greater." The contract provid-
ed that ACS would "install and support all traffic camera
equipment" and "supply an automated violation processing
services solution that is capable of supporting high volume
program operations."

On February 21, 2007, Rockville entered into a contract with
ACS employing them to perform services in connection with a
Photo Speed Enforcement Program. The Rockville contract
provided that ACS would be compensated as follows: "The
Contractor shall be compensated under this agreement at a
rate of $16.25 per paid citation or $2,999 per month per mobile
unit for the program, whichever is greater." On May 23,
2007, Gaithersburg entered into a contract with ACS employ-
ing them to perform services in connection with a Photo Speed
Enforcement Program. The Gaithersburg contract provided
that ACS would be compensated as follows: "The contractor
shall be compensated under this Agreement at a rate of $16.25
per paid citation or $2,999.00 per month per mobile unit for
the Program, as defined in the Montgomery County Contract,

---

4. The 2009 version of T.A. § 21–809(j) provides:
 (1) An agency or an agent or contractor designated by the agency
 shall administer and process civil citations issued under this section
 in coordination with the District Court.
 (2) If a contractor operates a speed monitoring system on behalf of a
 local jurisdiction, the contractor's fee may not be contingent on the
 number of citations issued or paid.

whichever is greater." On March 12, 2007, Chevy Chase entered into a contract with ACS employing them to perform services in connection with a Photo Speed Enforcement Program. The Chevy Chase contract provided that ACS would be compensated as follows: "The Contractor shall be compensated under this Agreement at a rate of $16.25 per paid citation or $6,000 per month for the program, whichever is greater." Each agreement between ACS and the Municipalities contained the following language: "The Contractor agrees to provide all goods and services described and be bound by the terms and conditions set forth in [the] Montgomery County Contract."

### *Original Complaint & Amended Complaint*

On May 2, 2008, Timothy P. Leahy[5] filed a Complaint in the Circuit Court for Montgomery County seeking $20 million on behalf of himself and others similarly situated against the County, Rockville, and Chevy Chase for the alleged violation of T.A. § 21–809. In the Complaint, Leahy alleged: "Defendants violated [T.A.] § 21–809(j) by entering into a contract with ACS, Inc., which provided that the contractor's fee is contingent on the number of citations issued or paid." On May 16, 2008, Leahy filed an Amended Complaint adding Gaithersburg as a defendant. On May 21, 2008, Leahy filed a Motion to Certify Class, seeking the circuit court to allow Leahy "to represent all individuals who have received traffic citations and paid fines as a result of the contracts between any Maryland government, including, but not limited to, the City of Rockville, Montgomery County and the Town of Chevy Chase and ACS, Inc., . . . for speed monitoring camera equipment at various intersections in Montgomery County[.]" In response, appellees filed motions to dismiss and/or for summary judgment and oppositions to Leahy's Motion to Certify Class.[6]

---

5. Leahy received two speed citations pursuant to T.A. § 21–809 on February 3, 2008, in Chevy Chase Village. On April 21, 2008, at a hearing in the district court, Leahy was fined $52.50.

6. On June 23, 2008, Chevy Chase filed an Answer to Leahy's Amended Complaint. On June 23, 2008, the County and Rockville filed a Motion

On August 26, 2008, the circuit court held a hearing on Leahy's Motion to Certify Class and the County's, Rockville's, and Chevy Chase's [7] Motions to Dismiss and/or Motions for Summary Judgment. As a result of the hearing, the circuit court: (1) granted Gaithersburg's Motion to Dismiss or for Summary Judgment, dismissing Leahy's claims against Gaithersburg with prejudice and without leave to amend; (2) dismissed Leahy's claims against Rockville with prejudice and without leave to amend; (3) granted the motion to dismiss as to the County with leave to amend; and (4) denied Leahy's Motion to Certify Class without prejudice to renew if a second amended complaint is filed.

### Second Amended Complaint

On October 6, 2008, ten named plaintiffs, Leahy; Matthew Charles Baker; Thomas Jeffrey Wheatley; Aristone Luiz Pereira, Jr.; Michael Brody; Johnny Ray Garza; Kenneth King Sleeman; David Alfred Schiller; Walter McKee; and Janet Marburger, collectively referred to as the plaintiffs,[8] filed on behalf of themselves and others similarly situated, a Second Amended Complaint against appellees. In the Second Amended Complaint, plaintiffs brought seven claims based in

---

to Dismiss and an Opposition to Leahy's Motion to Certify Class. On July 2, 2008, Gaithersburg filed a Motion to Dismiss or for Summary Judgment. On July 2, 2008, Chevy Chase filed a Motion for Summary Judgment. On July 2, 2008, Gaithersburg and Chevy Chase filed an Opposition to Leahy's Motion to Certify Class. On July 11, 2008, Leahy filed an Opposition to appellees' Motions to Dismiss and/or for Summary Judgment. On July 30, 2008, the circuit court issued an Order granting Chevy Chase's Motion for Summary Judgment. On August 21, 2008, Gaithersburg filed a Reply to Leahy's Opposition to its Motion to Dismiss or for Summary Judgment.

7. The circuit court had previously granted Chevy Chase's Motion for Summary Judgment, therefore; the circuit court only held a hearing on the County's, Rockville's and Gaithersburg's respective Motions to Dismiss and/or Motions for Summary Judgment.

8. Prior to this appeal, on June 19, 2009, Leahy voluntarily dismissed all of his claims against appellees with prejudice, and on September 28, 2009, Brody voluntarily dismissed all his claims against appellees with prejudice.

tort, one count of injunctive relief and one count of declaratory judgment.[9]

On November 17, 2008, Gaithersburg and Chevy Chase filed a Motion to Dismiss Second Amended Complaint or for Summary Judgment. On November 17, 2008, the County and Rockville filed an Answer to the Second Amended Complaint. On December 1, 2008, plaintiffs filed an Opposition to Gaithersburg's and Chevy Chase's Motion to Dismiss and/or for Summary Judgment. On January 5, 2009, Gaithersburg and Chevy Chase filed a reply to the plaintiffs' opposition.

A hearing was held on February 12, 2009, on Gaithersburg's and Chevy Chase's Motion to Dismiss Second Amended Complaint or for Summary Judgment. On February 18, 2009, the circuit court issued a written order which denied Gaithersburg's and Chevy Chase's Motion to Dismiss and/or for Summary Judgment without prejudice, permitting them to file a motion for summary judgment after completion of discovery. On March 16, 2009, Gaithersburg and Chevy Chase filed an Answer to the Second Amended Complaint.[10]

### *Motion for Class Certification & Third Amended Complaint*

On July 17, 2009, plaintiffs filed a Motion for Class Certification. On August 21, 2009, appellees filed oppositions.[11] On

---

**9.** The Second Amended Complaint included the following Counts: (1) Violation of Article 19 and 24 of the Maryland Declaration of Rights; (2) Unjust Enrichment; (3) Conversion (4) Constructive Trust; (5) Civil Conspiracy; (6) Breach of Fiduciary Duty; (7) Constructive Fraud; (8) Complaint for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief—Maryland Rule 15–501, *et seq.;* and (9) Declaratory Relief.

**10.** On March 30, 2009, Gaithersburg and Chevy Chase filed a Motion for Reconsideration of the Motion to Dismiss. On April 3, 2009, plaintiffs filed a Motion to Strike or Deny Gaithersburg's and Chevy Chase's Motion for Reconsideration. On April 20, 2009, Gaithersburg and Chevy Chase filed an Opposition to plaintiffs' Motion to Strike Gaithersburg's and Chevy Chase's Motion for Reconsideration. On May 6, 2009, the circuit court denied and struck from the record Gaithersburg's and Chevy Chase's Motions for Reconsideration.

**11.** On August 21, 2009, Gaithersburg and Chevy Chase filed an Opposition to plaintiffs' Motion for Class Certification. On August 21, 2009,

October 20, 2009, plaintiffs filed a Reply in Support of their Motion for Class Certification.

On October 7, 2009, eight named plaintiffs, Baker; Wheatley; Pereira; Garza, Sleeman; Schiller; McKee; and Marburger,[12] collectively referred to as appellants, filed a Third Amended Class Action Complaint on behalf of themselves and others similarly situated, against appellees.[13] The Third Amended Class Action Complaint included the following counts: (1) Violation of Article 19 and Article 24 of the Maryland Declaration of Rights; (2) Unjust Enrichment; (3) Conversion; (4) Constructive Trust; (5) Civil Conspiracy; (6)

---

the County and Rockville also filed an Opposition to plaintiffs' Motion for Class Certification.

12. The speed citations issued pursuant to T.A. § 21–809 to the plaintiffs were as follows:
 (1) Baker received two speed citations in Chevy Chase on July 9, 2008. Baker paid the fines associated with the citations.
 (2) Wheatley received a speed citation on July 19, 2008, in Rockville and paid the fine associated with the citation.
 (3) Pereira received a speed citation on April 4, 2008, and one on April 8, 2008, both in the County. Pereira paid the fines associated with the citations.
 (4) Garaza received two speed citations in Rockville, one on November 11, 2007, and another on November 13, 2007. Garaza received a third speed citation on November 24, 2007, in the County. Garaza paid the fines associated with the citations.
 (5) Sleeman received two speed citations in Rockville, one on September 29, 2007, and another on August 17, 2008. Sleeman received a speed citation in the County on February 10, 2008. Sleeman paid the fines associated with the citations.
 (6) Schiller received one speed citation in the County on June 25, 2008, and one speed citation in Rockville on September 4, 2008. Schiller paid the fines associated with the citations.
 (7) McKee received one speed citation in August 2008, in Gaithersburg. McKee paid the fine associated with the citation.
 (8) Marburger received one speed citation on February 23, 2008, in Chevy Chase. Marburger paid the fine associated with the citation.

13. On October 27, 2009, Gaithersburg and Chevy Chase filed a Motion to Strike appellants' Third Amended Class Action Complaint; however, Gaithersburg and Chevy Chase moved to withdraw this Motion on March 25, 2010. On October 30, 2009, the County and Rockville also filed a Motion to Strike appellants' Third Amended Class Action Complaint. On November 6, 2009, appellants filed an Opposition to the Motions to Strike.

Breach of Fiduciary Duty; (7) Constructive Fraud; (8) Temporary Restraining Order and Preliminary and Permanent Injunctive Relief–Maryland Rule 15–501, *et seq.;* and (9) Declaratory Relief. On March 25, 2010, Gaithersburg and Chevy Chase filed an Answer to the Third Amended Class Action Complaint.

On January 29, 2010, the circuit court held a hearing on appellants' Motion for Class Certification and addressed whether the appellants had "demonstrated that there should be a certification of class going forward with the lawsuit that's been filed in this case." The circuit court denied appellants' class certification as to Counts 1 through 7 of the Third Amended Class Action Complaint, which are the tort claims. As to the claim for injunctive relief and declaratory judgment, the circuit court granted the Motion for Class Certification.[14] On March 23, 2010, the circuit court by written order, restated the findings from the January 29, 2010, hearing—granting appellants' Motion for Class Certification as to Count 8 (injunctive relief) and Count 9 (declaratory relief) and denying the Motion as to all other counts.[15]

On April 1, 2010, appellants filed a Motion for Partial Summary Judgment, asking the circuit court to find that ACS was an operator of the speed monitoring system on behalf of Montgomery County within the meaning of T.A. § 21–809, *i.e.* a "contractor [who] operates a speed monitoring system." Appellees filed oppositions to appellants' Motion for Partial Summary Judgment.[16]

---

**14.** The Order specified that as to the injunctive relief count, the class is certified against all appellees except Chevy Chase. As to the declaratory judgment count, the circuit court found that the class was certified as to all appellees.

**15.** On February 16, 2010, appellants filed a Motion for Reconsideration of Ruling on Class Certification as to Counts 1–7 of the Third Amended Complaint. On March 25, 2010, appellants renewed their Motion for Reconsideration of the Order for class certification. On April 9, 2010, the County and Rockville, as well as, Gaithersburg and Chevy Chase filed oppositions to appellants' Motion for Reconsideration.

**16.** On April 19, 2010, the County and Rockville filed an Opposition to appellants' Motion for Partial Summary Judgment. On April 19, 2010, Gaithersburg and Chevy Chase filed an Opposition.

On April 2, 2010, Gaithersburg and Chevy Chase filed a Motion to Dismiss the Third Amended Class Action Complaint, or in the alternative, Motion for Summary Judgment. On April 2, 2010, the County and Rockville also filed a Motion to Dismiss and/or for Summary Judgment. On April 19, 2010, appellants filed a Consolidated Opposition to appellees' Motions to Dismiss and/or for Summary Judgment. On May 18, 2010, Gaithersburg and Chevy Chase filed a Reply to appellants' Opposition.

On June 15, 2010, the circuit court held a hearing on appellees' Motions for Summary Judgment and appellants' Motion for Partial Summary Judgment, asking the circuit court to find that ACS was the operator of the speed monitoring system located in appellees' respective jurisdictions.[17] On November 3, 2010, the circuit court issued a written order denying appellants' Motion for Partial Summary Judgment, granting appellees' Motions for Summary Judgment, and dismissing with prejudice appellants' Third Amended Class Action Complaint. In its Order, the circuit court stated its reasons for the findings, in pertinent part, as follows:

(1) The version of § 21–809(j) of the Transportation Article of the Annotated Code of Maryland, which was codified in 2006 Md. Laws 15, and which was in effect when each of the individually named [appellants] received their citations at issue, applied to [appellee] Montgomery County, Maryland, but did not apply to [appellees] Mayor and Council of Rockville, the City of Gaithersburg, and Chevy Chase Village;

(2) Based on the undisputed material facts, and based on the terms of art "speed monitoring system," "speed monitoring system operator," and "recorded image" as defined in both the previous and current version of § 21–809 of the Transportation Article of the Annotated Code of Maryland, the employees of [appellees], . . . perform the tasks required

---

17. At the hearing on June 15, 2010, counsel for Gaithersburg and Chevy Chase acknowledged: "The case has now gone through discovery. We're now at summary judgment, not at a motion to dismiss."

to be performed by the operator of a speed monitoring system under § 21–809(b) and (e) of the Transportation Article. Therefore, this Court finds that each of the [appellees] operates the speed monitoring systems in their respective jurisdictions, § 21–809(j) of the Transportation Article therefore is not implicated, and the various contracts between [appellees] and [ACS] do not violate § 21–809(j) of the Transportation Article. This finding entitles [appellees] to judgment on all counts of [appellants'] Third Amended Class Action Complaint;

(3) Even if this Court were to accept the expanded definitions of "speed monitoring system," "speed monitoring system operator," and "recorded image" as argued by [appellants], this Court finds and declares that none of the [appellees] have delegated final authority over when a citation alleging that an individual has violated § 21–809 of the Transportation Article is to be issued, and therefore, [appellees] operate the speed monitoring systems in their respective jurisdictions. Thus, this Court finds that each of the [appellees] operates the speed monitoring systems in their respective jurisdictions, § 21–809(j) of the Transportation Article therefore is not implicated, and the various contracts between [appellees] and [ACS] do not violate § 21–809(j) of the Transportation Article. This finding entitles [appellees] to judgment on all counts of [appellants'] Third Amended Class Action Complaint;

(4) Section 21–809 of the Transportation Article affords every individual who receives a citation alleging a violation of § 21–809 the opportunity to contest the citation in the District Court of Maryland. Further, pursuant to § 21–809(f)(1)(iii) of the Transportation Article, every individual who receives a citation alleging a violation of § 21–809 may raise any issue, and present any evidence, in defense of the citation, including the issues raised in [appellants'] Third Amended Class Action Complaint. Therefore, § 21–809 of the Transportation Article does not create a private right of action. This finding entitles [appellees] to judgment on

Counts 1–7 of [appellants'] Third Amended Class Action Complaint;

(5) This Court finds, based on the undisputed evidence, as well as the allegations contained in [appellants'] Third Amended Class Action Complaint, that each of the individual [appellants], . . . voluntarily paid the citations that they received, and which alleged that they violated § 21–809 of the Transportation Article. Because each of the [appellants] opted to voluntarily pay the citations they received, they did not contest their citations in a timely manner. Thus, by operation of § 21–809(d)(1)(xi) of the Transportation Article, each of the [appellants] admitted liability and a violation of § 21–809. Therefore, each of the [appellants] waived any right that they may have had to file a later action. This finding entitles [appellees] to judgment on Counts 1–7 of [appellants'] Third Amended Class Action Complaint[.]

On July 13, 2010, appellants filed a Notice of Appeal. On November 19, 2010, appellants filed a Renewed Notice of Appeal appealing the rulings of the circuit court from the January 29, 2010, hearing on appellants' Motion for Class Certification; the June 15, 2010, motions hearing on appellants' Motion for Partial Summary Judgment and appellees' Motions to Dismiss or for Summary Judgment; and the November 3, 2010, Order entered pursuant to those hearings.

## STANDARD OF REVIEW

Maryland Rule 2–501(f) states that a trial court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In reviewing a grant of summary judgment under Md. Rule 2–501(f), we review the circuit court's decision to grant a motion for summary judgment *de novo*. *Bonfiglio v. Fitzgerald*, 197 Md.App. 327, 337, 13 A.3d 812 (2011) (citations omitted). Our review is "two-fold," we determine first, whether there is a

genuine dispute of material fact, and second, whether the party is entitled to judgment as a matter of law. *Id.* In determining whether a material fact is in dispute, a trial court must give great deference to the non-moving party as well as must review the record in the light most favorable to the non-moving party. *Lipscomb v. Hess,* 255 Md. 109, 118, 257 A.2d 178 (1969) (citations omitted).

## DISCUSSION

### I. Private Cause of Action

Appellants contend that a private cause of action exists as a remedy for citizens to enforce T.A. § 21–809(j), which provides in pertinent part, that a "contractor's fee may not be contingent on the number of citations issued or paid." Appellants argue that they have a "right to pursue tort claims against the State government to remedy illegal acts," and to petition for "equitable relief to prevent a defendant from continuing illegal or improper actions." Appellants maintain that the General Assembly has the ability to prohibit a private cause of action, but, in this case, there is no such restriction in the statute. Appellants argue that the "imposition and collection of $40 fines pursuant to the contract with ACS is State action" and violates their right to due process. Appellants contend that the fines result in economic loss, a deprivation of their property interests, and constitute a "taking of property."

Appellants argue that three factors set out by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[18] are utilized by courts to determine whether to recog-

---

18. We note that the *Cort* factors have been reassessed and congressional intent has been described as the central inquiry in determining whether a private cause of action exists. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("It is true that in *Cort v. Ash,* the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three

nize a private cause of action. The factors include: (1) "the presence or absence of an indication of legislative intent to create a private remedy"; (2) "whether the plaintiff is one of the class for whose special benefit the statute was enacted"; and (3) "whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." Appellants contend that the *Cort* factors for establishment of a private cause of action are satisfied in this case.

In contrast, appellees [19] argue that no private cause of action exists under T.A. § 21–809(j). Appellees contend that "[i]n the absence of a statutory directive, [ ] Maryland courts have uniformly held that it is not appropriate to expand a statute to include remedies that were not specified." Appellees point out that when the General Assembly "expressly provides a remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." Appellees agree with appellants that the *Cort* factors are applicable in determining whether a private cause of action exists; however, appellees contend that the factors are not satisfied in this case.

Appellees argue that T.A. § 21–809 was enacted to benefit drivers on the highways whose safety is endangered by speeding, and was not enacted for the special benefit of individuals who exceeded the speed limits and admitted liability.[20] Appel-

---

factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, see 422 U.S. at 78, 95 S.Ct. 2080— are ones traditionally relied upon in determining legislative intent."); *see also Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 23–34, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

**19.** All appellees make similar arguments regarding this issue, as such, this Court will refer to the County, Rockville, Gaithersburg, and Chevy Chase collectively as appellees.

**20.** The Municipalities argue that T.A. § 21–809(j) does not apply to them, as the 2006 version of T.A. § 21–809(j) states: "If a contractor operates a speed monitoring system **on behalf of Montgomery County,** the contractor's fee may not be contingent on the number of citations issued or paid." (Emphasis added). The Municipalities point out that they are incorporated municipalities and, therefore, T.A. § 21–809(j) "was certainly not enacted for the 'special benefit' of a class of individuals such as [a]ppellant whose citations were based on speed monitoring

lees point out that the statute's legislative history is silent as to providing for or prohibiting a private right of action, and this silence "weighs heavily" against an intent to create a private cause of action. Appellees point out that T.A. § 21–809 provides a "detailed and comprehensive remedy to contest liability for a speed camera citation."

Appellees argue that the General Assembly has demonstrated that it is fully able to explicitly include a private cause of action in those statutes in which it intends a private cause of action will lie. Under the public duty doctrine, appellees maintain that "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.' " [21]

The determination of whether a private cause of action is implicit in a statute which does not expressly provide for such an action, involves an analysis of three factors. *Cort*, 422 U.S. at 78, 95 S.Ct. 2080. The Supreme Court explained these factors in *Cort*, 422 U.S. at 78, 95 S.Ct. 2080. The first factor involves determining whether the plaintiff is " 'one of the class for whose [ ]special benefit the statute was enacted[.]' " *Id.* The second factor involves examining whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one[.]" *Id.* The third factor involves determining whether it is "consistent with the under-

---

systems that were **not** operated 'on behalf of Montgomery County.' " (Emphasis in original).

21. The County and Rockville in addition to the arguments raised above, contend that "[e]ven [ ] fundamental constitutional right[s] can be knowingly and voluntarily waived" and, in this case, all of the appellants waived the right to trial and to bring a cause of action by admitting liability and paying the fine imposed by the citation. The County and Rockville contend that appellants' suit is an impermissible collateral attack, and by paying their citations appellants have waived their right to challenge whether the citations they received were defective.

At oral argument, appellants conceded that all appellants involves in this case paid the $40 fine associated with the speed citations.

lying purposes of the legislative scheme to imply such a remedy for the plaintiff[.]" *Id.*

In *Erie Ins. Co. v. Chops*, 322 Md. 79, 82–83, 91, 585 A.2d 232 (1991), the Court of Appeals applied the three-factor analysis in determining whether a private cause of action existed where a plaintiff sued an insurance company for negligence, alleging that the insurance company breached a duty imposed upon it by T.A. § 17–106(b) (1977 & Supp. 1987).[22] Pursuant to T.A. § 17–106(b), insurance companies are to immediately notify the Motor Vehicle Administration of the cancellation of a driver's automobile insurance policy. *Erie*, 322 Md. at 83, 585 A.2d 232.

In *Erie*, the Court reiterated the factors described in *Cort* stating that in order to determine whether a private cause of action exists, Maryland courts have analyzed three factors: (1) "the presence or absence of an indication of legislative intent to create a private remedy"; (2) "whether the plaintiff is one of the class for whose special benefit the statute was enacted"; and (3) "whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Id.* at 90–91, 585 A.2d 232. The Court acknowledged that "more recent decisions of the Supreme Court have indicated that implication of a private right of action 'is limited solely to determining whether Congress intended to create the private right of action.'" The Court nevertheless noted that earlier cases involved an analysis of all three of the factors described in *Cort*. *Id.* The Court explained that Maryland applies a "more flexible approach" than the approach suggested in *Cort*, stating that the Court "has not hesitated to change the common law to permit new actions or remedies where that

---

22. In *Erie*, plaintiffs were involved in a car accident with Carol Iser, who was driving an uninsured vehicle. 322 Md. at 81, 585 A.2d 232. Two months prior to the accident, Erie Insurance canceled Iser's insurance, but failed to notify the MVA until 40 days after the termination. *Id.* at 83, 585 A.2d 232. As such, plaintiffs claimed that Erie Insurance breached its duty to notify the MVA immediately of the insurance termination pursuant to Md.Code Ann., Transp. I, 17–106(b). *Id.* at 82–83, 585 A.2d 232.

course was appropriate." *Id.* at 91, 585 A.2d 232. In *Erie*, however, the Court found that no private cause of action existed, stating:

> Although the [plaintiffs] may properly be said to be within the class of persons in whose favor the statute was intended, **it seems equally apparent that the principal focus of the uninsured motorist laws is for the general protection of the public.** Additionally, while permitting recovery by the plaintiffs would not be inconsistent with the underlying purpose of the legislative scheme, **we do not believe such a broad extension of existing law is necessary to properly implement the legislation.** We note that the legislature has provided other remedies for those who are involved in accidents with uninsured motorists, including the requirement of uninsured motorist coverage in every automobile liability policy issued, sold, or delivered in this State, Art. 48A, § 541(c)(2), and the establishment of a fund for payment of claims arising out of accidents with uninsured motorists occurring in this State. Article 48A, § 243H(a)(3). Finally, as we have noted, the legislature did not expressly or impliedly establish the sanction sought by the plaintiffs, even though the legislature has done so in other related matters involving insurance.

*Id.* at 91–92, 585 A.2d 232 (emphasis added).

In *Sugarloaf Citizens Ass'n, Inc. v. Gudis,* 78 Md.App. 550, 552–53, 560, 554 A.2d 434 (1989), *aff'd on other grounds,* 319 Md. 558, 573 A.2d 1325 (1990),[23] we held that no private cause of action existed for a citizens association to claim that a county council vote approving a site location for a resource recovery facility near PEPCO property, violated a conflict of interest provision of the Montgomery County Public Ethics

---

**23.** The Court of Appeals affirmed this Court's decision in *Sugarloaf* stating: "We affirm the judgment of the Court of Special Appeals, but for reasons totally different from those given by that court. We conclude that § 19A–22(b) of the Montgomery County Code is unconstitutional. Since Sugarloaf relies on that subsection as authority for the court's power to strike down the legislative action here in question, Sugarloaf cannot prevail." 319 Md. at 563, 573 A.2d 1325.

Law.[24] This Court preliminarily concluded that the statute did not expressly provide for a private cause of action. *Id.* at 560, 554 A.2d 434. We explained that in determining whether a private cause of action exists, "[t]he primary focus in resolving such a question is the legislative intent." *Id.* at 556, 554 A.2d 434 (citations omitted). We stated:

In determining legislative intent, various factors are examined:

including the legislative history and purposes of the statute, the identity of the class for whose particular benefit the statute was passed, the existence of express statutory remedies to serve the legislative purpose[.]

*Id.* at 557, 554 A.2d 434 (citation and footnote omitted). With Judge Paul E. Alpert speaking for this Court, we explained that: "Where the legislative history does not indicate any discussion whatsoever as to whether a statute gives rise to such a right, the fact that the ordinance is silent would weigh heavily against an intent by the council to create a private cause of action." *Id.* We qualified this by stating that the "vast differences in legislative record-keeping between Congress and a municipal or local government," made us "hesitate to place such great weight on the fact that the legislative history available to us is silent as to whether the Montgomery County Council intended to create an implied private right of action." *Id.* at 558, 554 A.2d 434.

We, therefore, analyzed the purpose of the statute and the express statutory remedies within the statute. *Id.* at 558–62, 554 A.2d 434. In examining the express statutory remedies, we explained that:

[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.

---

24. The vote in the County Council to choose between two sites for the resource recovery facility resulted in a 4–3 vote in favor of the site near the PEPCO property, and one of the council members who voted in favor of the resolution owned stock in PEPCO. *Id.* at 552–53, 573 A.2d 1325.

"When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."

. . . .

See also *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.")[.]

*Id.* at 559–60, 554 A.2d 434 (some citations omitted). *Accord, Maryland–National Capital Park and Planning Commission v. Anderson*, 179 Md.App. 613, 630, 947 A.2d 149 (2008) ("Where the legislature has provided a remedy, the litigant must pursue that designated form of remedy, rather than to seek some alternative form to circumvent the procedures promulgated by the legislature.") (citation omitted).

In *Magan v. Med. Mut. Liab. Ins. Soc'y of Md.*, 331 Md. 535, 538, 629 A.2d 626 (1993), the Court of Appeals determined the definition of the term "restitution" as used in Section 55A of Maryland's Insurance Code, which provided that the Insurance Commissioner may require that restitution be made when the Commissioner is imposing sanctions upon an insurer whose certificate of authority is subject to revocation or suspension because of a violation of the Insurance Code. The Court held that: "Given the choice of finding that the legislature intended to grant limited restitutory powers consistent with relief it has granted in similar cases of improper refusal or termination of coverage, or that it intended to give the Insurance Commissioner virtually unlimited power to award general and special compensatory damages, we are strongly inclined to believe that the legislature intended the former." *Id.* at 546, 629 A.2d 626 (footnote omitted). In support of this holding, the Court cited *Erie*, stating: "We have been reluctant to find an implied grant of a private cause of action, even when the further complication of delegation of authority to an administrative agency was not involved." *Magan*, 331 Md. at 546, n. 4, 629 A.2d 626 (citation omitted).

Returning to the instant matter, based on a plain reading of the statute, we conclude that T.A. § 21–809 does not expressly provide for a private cause of action. We must, therefore, determine whether a private cause of action is implicit in T.A. § 21–809. As such, we will address the three factors discussed in *Cort* and applied in *Erie:* (1) The presence or absence of an indication of legislative intent to create a private remedy; (2) whether the plaintiff is one of the class for whose special benefit the statute was enacted; and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff. *Cort,* 422 U.S. at 78, 95 S.Ct. 2080; *Erie,* 322 Md. at 90–91, 585 A.2d 232.

### (1) Legislative Intent

As this Court explained in *Sugarloaf,* in determining whether a private cause of action exists, "[t]he primary focus in resolving such a question is the legislative intent." 78 Md.App. at 556, 554 A.2d 434 (citations omitted). As such, our "primary focus" is to determine the legislative intent as to a private cause of action under T.A. § 21–809. In *Lockshin v. Semsker,* 412 Md. 257, 274–77, 987 A.2d 18 (2010), the Court of Appeals set out the "[p]ertinent [p]rinciples of [s]ound [s]tatutory" interpretation that are applicable in this case:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous

language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

. . . .

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

(Citations omitted).

Nowhere in the plain language of T.A. § 21–809 did the General Assembly evidence an intent to create a private cause of action. The statute, by its plain language, demonstrates a clear intent on the part of the legislature to enforce the speed limits in residential areas and school zones, and expressly provides for a specific remedy—people who receive speed citations pursuant to T.A. § 21–809(c) may challenge the citation by following the process outlined in T.A. § 21–809(d)(5). T.A. § 21–809(d)(1)(x) provides that every citation issued must include information about the manner and time in which liability as alleged in the citation may be contested in the district court. If a person elects to stand trial in the district court for the alleged violation, the burden is on the County or municipality to show by a preponderance of the evidence that the person was speeding. T.A. § 21–809(e). The person may request the presence of the speed monitoring operator to testify at trial. *Id.* Pursuant to T.A. § 21–809(f), the district court may consider defenses such as: (1) whether the motor

vehicle or the registration plates of the motor vehicle were stolen before the violation occurred and were not under the control or possession of the owner at the time of the violation; or (2) evidence that the person named in the citation was not operating the vehicle at the time of the violation. The district court may also consider "[a]ny other issues and evidence that the District Court deems pertinent." *Id.* (emphasis added).

House Bill ("H.B.") 443, first introduced in the General Assembly on February 1, 2005, provided for the enactment of T.A. § 21–809. H.B. 443 contained the legislative purpose of T.A. § 21–809 and made clear the legislature's intent to create a specific process by which a person may challenge a speed citation. The purpose of T.A. § 21–809 as stated in pertinent part, in H.B. 443 was for:

> [E]stablishing certain maximum fine[s] for a violation of law enforced by means of a speed monitoring system under this Act; ... establishing the standard of proof in a trial for a violation of law enforced by means of a speed monitoring system under this Act; requiring the Chief Judge of the District Court, in consultation with certain county agencies, to adopt certain procedures; authorizing persons receiving citations to have the speed monitoring system operator be present and testify at trial; providing that certain persons are responsible for paying the civil penalty indicated on the citation under certain circumstances; providing that persons receiving citations may elect to stand trial in the District Court; establishing defenses that the District Court may consider; authorizing vehicle owners to submit a certain letter to the District Court to establish a certain defense; authorizing the Motor Vehicle Administration to impose certain penalties if the person cited under this Act fails to pay the civil penalty or contest liability; ... providing for the admissibility and use of certain evidence; modifying the jurisdiction of the District Court to include certain proceedings; providing for the handling of certain court costs and penalties[.]

█ In discerning legislative intent a court may search "indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Lockshin v. Semsker*, 412 Md. 257, 276, 987 A.2d 18 (2010). In this case, as part of the legislative process, the Montgomery County Delegation of the Maryland General Assembly Transportation Committee submitted a report on January 21, 2005, recommending the enactment of H.B. 443, stating that "a significant number of speeding related deaths occur on highways where the speed limit is under 35 miles per hour, the highways on which speed monitoring systems are authorized to be placed under the bill, and that speed monitoring systems are an effective and cost effective way of trying to alleviate the situation." In support of enacting the speed camera program, Delegate Bronrott and Senator Forehand of the Montgomery County Delegation wrote a memorandum in support, stating: "This bill would provide a means to enhance enforcement of speed limits in the face of limited police resources in Montgomery County."

After H.B. 443 was introduced, numerous members of the County government and the public sent reports, letters, and gave testimony at public hearings in support of the Bill. On November 15, 2004, James W. Clarke, Vice President of the Action Committee for Transit, wrote a statement in support of H.B. 443: "The bill before you is designed to slow down speeders. Where [they have] been used in other places[,] photo radars [have] been shown to [do] just this, slow down speeders." The City of Takoma Park provided testimony at a Montgomery County Delegation Public Hearing held on November 14, 2005, supporting H.B. 443 and stated: "The safety of our pedestrians, bicyclists, bus riders and drivers is a top priority for the Takoma Park City Council. We have had too many transportation-related deaths in our community.... Speeding is a factor in many accidents and often occurs in the same locations." The Manager of Chevy Chase Village also testified on November 14, 2005, and stated: "The potential this technology represents would be a significant enhancement to pedestrian safety and could establish a consistent, round-

the-clock, level of enforcement and traffic calming." Jacqueline Gilan, Vice President of the Advocates for Highway and Auto Safety, testified at the November 15, 2004, hearing that "[a]llowing the Montgomery County Police to enforce Montgomery County speed limits using photo enforcement will save taxpayer dollars, save police resources and, most importantly, save lives." On behalf of the Rockville City Council and the Mayor, Bo Ferguson testified at the November 15, 2004, hearing in support of H.B. 443, stating that "[w]e want drivers to obey our speed limits. Speed limits exist in order to protect our residents." As such, the public expressed support for T.A. § 21–809 on the basis that the statute would help reduce the amount of speed-related accidents and deaths in the County. As Gaithersburg and Chevy Chase point out, and we concur, the legislature clearly intended to promote safety by enforcing speed limits on certain highways, namely residential areas and school zones when enacting T.A. § 21–809.

As the Court explained in *Sugarloaf*,[25] when a statute provides a particular remedy, "a court must be chary of reading others into it" and "when legislation expressly provides a remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." 78 Md.App. at 559–60, 554 A.2d 434 (citations omitted). As such, this Court should not read into T.A. § 21–809 a private cause of action when a particular remedy is already specifically expressed within the statute. "Where the legislature has

---

**25.** Appellants contend that in *Sugarloaf*, "there was no showing of a taking of specific property from a specific subgroup[,]" whereas here, a subgroup exists—"those who received citations based on a system that pays a contingent fee to the contractor." We find no merit in appellants' argument that *Sugarloaf* is inapplicable. Appellants argue that the holding in *Sugarloaf*, that no private cause of action existed, was partially based on the Court's determination that: "The statutory scheme was not designed to protect any sub-group of the public, or to preserve or create individual rights" and "[a] statute regulating the ethical conduct of public employees is clearly one ... enacted for the purpose of protecting society as a whole." 78 Md.App. at 558–59, 554 A.2d 434. T.A. § 21–809 was enacted to promote speed enforcement at the cost of those who speed and to promote highway safety, it was not enacted to protect the subgroup of those who speed.

provided a remedy, the litigant must pursue that designated form of remedy, rather than to seek some alternative form to circumvent the procedures promulgated by the legislature." *Anderson*, 179 Md.App. at 630, 947 A.2d 149 (citation omitted). As a result, appellants are entitled only to pursue the process set forth in T.A. § 21–809 as the designated form of remedy in challenging the lawfulness of the citations received—a private cause of action is not permissible.

■ Appellants claim that the process provided in T.A. § 21–809 to challenge a citation is merely procedural, and does not afford appellants an opportunity to "challenge the constitutional due process defects of the system, or its violation of the fundamental prohibition against contingent fees[.]" T.A. § 21–809(f)(1)(iii) specifically provides, however, that the district court may consider "[a]ny other issues and evidence that the District Court deems pertinent." (Emphasis added). Although appellants argue that it is impractical to bring an action challenging the propriety of a contingency fee in the district court, we see no other way to interpret the plain language of this provision—appellants are permitted to raise any defense in the district court regarding the legality of the citation. Appellants, therefore, had the opportunity—which they failed to exercise—to challenge in the district court the speed citations they received, presenting the argument that the contracts between appellees and ACS were unlawful.

### (2) Class For Whose Special Benefit T.A. § 21–809 Was Enacted

■ Appellants—individuals cited for speeding—are not within the class of people for whose special benefit T.A. § 21–809 was enacted. As discussed above, when H.B. 443 was first introduced it was described as a bill that would promote highway safety and help reduce the amount of speed related accidents and deaths. T.A. § 21–809 was clearly enacted for the benefit of drivers, bus riders, pedestrians, and bicyclists on those highways whose safety is endangered by drivers who speed.

Appellants argue that they are part of a class for whom T.A. § 21–809(j) was enacted as the purpose of section (j) was to "prevent the operation of the speed monitoring systems by persons with a financial incentive to increase the number of citations issued." Appellants contend that they are part of a subgroup protected by T.A. § 21–809(j), which includes those who were given citations but were not violating the speed limit. We disagree. The second *Erie* factor requires an analysis of the statute as a whole and not an analysis of one specific provision or subsection. Appellants conceded at oral argument that no Maryland case has ever interpreted this factor to be applied in terms of specific provisions within a statute. Rather, Maryland case law instructs that in determining for whose special benefit a statute is enacted, a court must look at the entire statute and not specific or individual sections within the statute. Viewing the statute as a whole, it is abundantly clear that T.A. § 21–809 was enacted for the benefit of the public, and individuals who obey the speed limit, and to enforce speed limits in residential areas and in school zones.

Were we to adopt appellants' logic and find that T.A. § 21–809(j) was enacted for the benefit of those who did not speed but received citations, we would, nonetheless, conclude that appellants have removed themselves from this class by admitting liability and paying the $40 fine associated with the speed citations. We are mindful that appellants contend that they paid the fines only to avoid the extra time and cost to dispute the citation in court, and not because they were admitting liability. The plain language of T.A. § 21–809, however, is clear. T.A. § 21–809(d)(1)(xi) provides, in pertinent part that: All citations must contain "[i]nformation advising the person alleged to be liable under this section that failure to pay the civil penalty **or to contest liability in a timely manner: 1. Is an admission of liability[.]**" (Emphasis added). T.A. § 21–809(d)(5) provides that: "A person who receives a citation under paragraph (1) of this subsection may: (i) Pay the civil penalty, in accordance with instructions on the citation, directly to the Montgomery County Department of

Finance; or (ii) Elect to stand trial in the District Court for the alleged violation." Appellants admitted liability by paying the fines associated with the citations and by failing to contest the speed citations. As a result, appellants are not members of the class that they argue for whose special benefit T.A. § 21–809(j) was enacted.

Maryland courts have consistently declined to find that a private cause of action exists where the person bringing the action is not in the class of people for whose special benefit the statute was enacted. In *Hayes v. State*, 183 Md.App. 742, 745, 963 A.2d 271 (2009), Hayes was accused by his ex-wife of abusing their minor daughter, and the Department of Social Services found that he was an "indicated child abuser." This finding was overturned and Hayes brought a negligence action against the Department based on its failure to conduct a "thorough investigation" as required by Md.Code, Family Law Article ("F.L.") § 5–706(a) (1984, 2006 Repl.Vol.). *Hayes*, 183 Md.App. at 745, 963 A.2d 271. The circuit court dismissed Hayes' complaint for failure to state a claim, finding that F.L. § 5–706(a) "does not create a legally cognizable duty" to the alleged abuser. *Id.* We affirmed the circuit court holding that: "The Court of Appeals has recognized a limited statutory duty on the part of DSS to investigate reports of child abuse. However, that duty runs to the children who are the subject of the reports and not to their parents." *Id.* at 746, 963 A.2d 271 (citation omitted).

In *Willow Tree Learning Ctr., Inc. v. Prince George's County*, 85 Md.App. 508, 510, 584 A.2d 157 (1991), a child was injured on a frayed rope that was part of playground equipment at a private day-care center. The parents of the child argued "that the frayed rope was a violation of applicable safety regulations, and that under Md. Regs.Code title 10, § .05.01.16 ("COMAR") and the Prince George's County Code, a duty was created on the part of the [County] to discover and report it." *Id.* at 513–14, 584 A.2d 157 (footnote omitted). We held that "the State [n]or the County ... owe[s] any individual duty of care merely by the enactment of a general ordinance requiring safety inspections, nor by the fact that it undertook

inspections for safety violations. The duty created by the statute and ordinance was one owed to the public generally." *Id.* at 515, 584 A.2d 157; see also, *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372 (2002) ("[A]bsent a special relationship between a 911 employee and an individual in need of emergency services, an employee does not owe such an individual a private duty in tort.").[26]

In this case, the plain language as well as the legislative history of T.A. § 21–809, and applicable case law support the conclusion that appellants are not within the class of people for whose special benefit T.A. § 21–809 was enacted.

### (3) Consistency with the Underlying Purposes of the Legislative Scheme to Imply a Private Cause of Action

It is inconsistent with the underlying purposes of the legislative scheme to imply a private cause of action for appellants under T.A. § 21–809. Simply put, a finding by this Court of the existence of a private cause of action would be inconsistent with the provision in T.A. § 21–809, which details the manner in which to oppose a citation under the statute.

 In sum, we conclude that none of the factors identified in *Cort* are satisfied under the circumstances of this case. As a result, we hold that no private cause of action exists for appellants to seek redress for an alleged violation of T.A. § 21–809(j).[27] Although we review this issue *de novo,* we agree with the circuit court that:

---

**26.** Appellants contend that *Willow Tree* and *Muthukumarana* are inapplicable as these cases focus on duties to the public instead of to a particular class of individuals. We find this argument to be without merit. T.A. § 21–809 was not enacted for the special benefit of speeders, such as appellants, rather, T.A. § 21–809 was enacted to promote safety at the cost of those who speed.

**27.** We note that appellants did not sue as taxpayers or allege standing as taxpayers. *Boitnott v. Mayor & City Council of Baltimore,* 356 Md. 226, 234, 738 A.2d 881 (1999) ("Maryland has gone rather far in sustaining the standing of taxpayers to challenge ... alleged illegal and ultra vires actions of public officials. The taxpayer plaintiff need not

Section 21–809 of the Transportation Article affords every individual who receives a citation alleging a violation of § 21–809 the opportunity to contest the citation in the District Court of Maryland. Further, pursuant to § 21–809(f)(1)(iii) of the Transportation Article, every individual who receives a citation alleging a violation of § 21–809 may raise any issue, and present any evidence, in defense of the citation, including the issues raised in [appellants'] Third Amended Class Action Complaint. Therefore, § 21–809 of the Transportation Article does not create a private right of action. This finding entitles [appellees] to judgment on Counts 1–7 of [appellants'] Third Amended Class Action Complaint[.]

As such, we conclude that the circuit court properly granted summary judgment as to all appellees on Counts 1 through 7 [28] of appellants' Third Amended Class Action Complaint.[29]

---

allege facts which necessarily lead to the conclusion that taxes will be increased; rather, the question is whether the taxpayer reasonably may sustain a pecuniary loss or a tax increase ... whether there has been a showing of potential pecuniary damage.") (citations and internal quotations omitted). At oral argument, appellants agreed that they were not alleging standing as taxpayer plaintiffs, but rather seeking a private cause of action under T.A. § 21–809.

28. Counts 1 through 7 of appellants' Third Amended Class Action Complaint are tort claims for: (1) Violation of Article 19 and Article 24 of the Maryland Declaration of Rights; (2) Unjust Enrichment; (3) Conversion; (4) Constructive Trust; (5) Civil Conspiracy; (6) Breach of Fiduciary Duty; and (7) Constructive Fraud.

29. "[A] county may not create a new cause of action between private parties concerning matters of statewide concern." *Gunpowder Horse Stables v. State Farm Auto. Ins. Co.*, 108 Md.App. 612, 633, 673 A.2d 721 (1996). In *McCrory Corp. v. Fowler*, 319 Md. 12, 20, 24, 570 A.2d 834 (1990), *superseded by statute as stated by Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 994 A.2d 411 (2010), the Court of Appeals addressed whether a section in the Montgomery County Code, which authorized "a private citizen to seek redress for another private citizen's violation of a county anti-employment discrimination ordinance by instituting a judicial action in the court of the State for, *inter alia*, unlimited money damages[,]" was within the power of the County to enact. The Court found that this provision, which created a new judicial cause of action between private citizens, was not a "local law" and it encroached upon an area that had been in the province of state

As to the appeal of the circuit court's denial of injunctive and declaratory relief, we find those issues to be moot. "A moot question has been defined as one where 'there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.'" *Sugarloaf,* 78 Md.App. at 554, 554 A.2d 434 (citations omitted); *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 57, 703 A.2d 1338 (1998) ("[T]he test for mootness as whether 'a case presents a controversy between the parties for which, by way of resolution, the court can fashion an effective remedy.'") Prior to the initiation of the appeal in this case, the contracts between ACS and appellees were amended. On September 4, 2008, the contract between ACS and the County was amended to include the following language: "Contractor provides vehicles and equipment, but does not operate the speed monitoring system" and "[t]he County has the sole responsibility to operate the speed monitoring system." On November 17, 2008, the contract between ACS and Rockville was amended to include the same language: "Contractor provides vehicles and equipment, but does not operate the speed monitoring system" and "[Rockville] has the sole responsibility to operate the speed monitoring system."

On February 9, 2009, the contract between ACS and Chevy Chase was amended. Pursuant to this amendment the method of compensation was changed and ACS was now to be compensated as follows: (1) $37,000 per month per fixed pole

---

agencies. 319 Md. at 20, 570 A.2d 834. The Court held that it was not within the power of Montgomery County to enact such a law, stating that "the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by [the Court of Appeals] under its authority to modify the common law of this State." *Id.* at 20, 24, 570 A.2d 834 (citations omitted).

Creating a private cause of action pursuant to T.A. § 21–809 would set precedent for the state that could in effect encroach upon an area traditionally within the province of state agencies. Although not dispositive, we note that the Court's reasoning in *McCrory* supports our holding in this case.

unit utilizing radar detection; (2) $16,280 per month for each can cam utilizing radar detection; (3) $37,000 per month per fixed pole unit utilizing laser detection; (4) $37,000 per month for each can cam utilizing laser detection; and (5) $37,000 per month per fixed pole and no additional charge per can cam for 4 fixed pole units utilizing laser detection and 2 laser can cams. The amendment also added the following language to the Special Terms and Conditions, Contractor's Responsibilities, Vehicles and Equipment section: "Contractor provides vehicles and equipment, but does not operate the speed monitoring system" and "[Chevy Chase] has the sole responsibility to operate the speed monitoring system."

On June 4, 2009, the contract between ACS and Gaithersburg was amended to include language that the "[c]ontractor provides vehicles and equipment, but does not operate the speed monitoring system" and "[Gaithersburg] has the sole responsibility to operate the speed monitoring system."

We are aware of appellants' insistence that the amendments to the contracts between appellees and ACS do not resolve the contention that ACS is an operator of the speed cameras. We discern, however, no basis to look beyond the plain, unambiguous language of the contracts, which specifically provides that appellees and not ACS are operators of the speed cameras in Montgomery County. *Ocean Petroleum, Co. v. Yanek,* 416 Md. 74, 86, 5 A.3d 683 (2010) ("We employ in Maryland an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation." Finding no ambiguity in the contract language, "[t]his undertaking requires us to restrict our inquiry to 'the four corners of the agreement,' and ascribe to the contract's language its 'customary, ordinary, and accepted meaning.' ") (citations omitted). Based on the amendments, we conclude that there is no longer an existing controversy between the parties, and as such, there is no longer any effective remedy which the court could provide.[30]

JUDGMENT OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY AFFIRMED. COSTS TO BE PAID
BY APPELLANTS.

30. Appellants stated at oral argument that if this Court found that no
private cause of action existed, then this Court need not address
appellants' other issues raised on appeal. We agree.